The State of Ohio, Appellee, *v.* Conway, Appellant.

[Cite as *State v. Conway,* 108 Ohio St.3d 214, 2006-Ohio-791.]

(No. 2003–0647—Submitted August 23, 2005—Decided March 8, 2006.)

Lanzinger, J.

{¶ 1} On January 19, 2002, Jason Gervais was shot and killed and Mandel Williams was shot and wounded outside a strip bar in Columbus, Ohio. James T. Conway III was indicted, tried, and convicted by a jury of the aggravated murder of Gervais. He now appeals his convictions and sentence of death.

{¶ 2} Evidence at the trial revealed that on the evening of January 18, 2002, Conway met a group of friends at Dockside Dolls, a strip bar in Columbus, Ohio. Among the group was Conway's brother, Jeff Conway. Conway and his friends had visited Dockside Dolls ("Dockside") regularly during the previous month. The group was well known at Dockside, having spent large sums of money buying expensive bottles of champagne and giving generous tips to the dancers and staff.

{¶ 3} At closing time, approximately 2:30 a.m. on January 19, 2002, a fight erupted in the Dockside parking lot. Witness accounts varied. Some described the fight as a racial confrontation between a large group of white males (Conway's group) and a smaller group of black males. Others did not believe that the fight was racially charged. The brawl lasted several minutes and involved between 25 and 40 people.

{¶ 4} During the fighting, Mandel Williams, who was part of the group of black males, cut Conway's brother Jeff with a knife. Jeff told his brother that he had been cut and pointed out Williams as his attacker.

{¶ 5} At this point, some witnesses heard someone say, "I'm going to get my gun." Conway and his friend, Rob Myers, went to a car parked just east of the club's entrance, from which Myers retrieved a .45–caliber semiautomatic handgun. Either Conway or Myers cleared a round from the gun and chambered a live round. When Conway took the gun from Myers, one witness heard Conway say, "I'll kill you guys."

{¶ 6} Conway then moved fast through the parking lot toward Williams. When he was within 30 feet, Conway began shooting at Williams. According to some witnesses, after Conway began shooting, Williams and Jason Gervais, an innocent bystander, became entangled. Others testified that Williams had pulled Gervais

into the line of fire in an effort to avoid being shot. In either event, Conway continued to shoot at both Williams and Gervais as he walked toward them. In the end, Conway emptied his weapon, firing a total of eight shots at the two. Conway was within eight feet of Williams and Gervais when he fired the last shots into them as they lay on the ground. After the shooting, Conway and the other members of his group, including his brother, fled the scene and went to Big Mike's Palace, an after-hours nightclub.

{¶ 7} Gervais had been hit four times—once in his left lower back, once in his upper left leg, once in his right buttock, and once in his lower left leg—and died as a result of the bullet that entered his back, which penetrated his left lung. Williams had also been hit four times—once in his left shoulder, once in his left wrist, once in his left knee, and once in his right ankle—but survived.

{¶ 8} Conway was indicted on three counts, including one count of aggravated murder. Count 1 charged that he purposely and with prior calculation and design caused the death of Gervais, R.C. 2903.01(A); Count 2 charged him with the attempted aggravated murder of Williams, R.C. 2923.02(A) and 2903.01(A); Count 3 charged him with having a weapon while under a disability, R.C. 2923.13.

{¶ 9} The aggravated-murder count contained a death-penalty specification, charging aggravated murder as part of a course of conduct involving the purposeful killing or attempt to kill two or more persons. R.C. 2929.04(A)(5). Counts 1 and 2 also contained firearm specifications.

{¶ 10} During the jury trial, the state called Ronald Trent as a witness. Trent was Conway's cellmate following Conway's arrest on February 23, 2002. After discovering that Trent was a distant cousin, Conway confided to Trent that he was the Dockside shooter. Conway told Trent that he had shot Williams for cutting his brother, Jeff. According to Trent, Conway was not concerned when Gervais had gotten in the way, because Conway had had a .45–caliber handgun and knew that the bullets would go through Gervais and hit Williams.

{¶ 11} During their incarceration, Conway also attempted to involve Trent in a plot to kill Brian McWhorter, who had been with Conway at Dockside on the night of the shooting. Because Conway was concerned that McWhorter would testify against him, he offered Trent $30,000 to kill McWhorter and gave him $5,000 as an advance payment. In addition, Conway wanted Trent's help in a scheme to manufacture evidence by videotaping a person who resembled Conway confessing to the Dockside shooting.

{¶ 12} The state called Mark J. Hardy, a firearms and ballistic expert with the Columbus Police Department. Hardy identified all spent shell casings and bullets and one live round recovered from the scene as .45–caliber ammunition. No weapon was recovered, but Hardy was able to establish that all spent bullets and casings had been fired from the same weapon.

216

{¶ 13} At trial, the defense called Ron Edwards, a criminal investigator, and Conway's brother, Jeff Conway, also testified.

{¶ 14} Edwards had photographed the crime scene and testified regarding what he believed to be bullet strikes on the side of the Dockside building where the shooting had occurred. Edwards testified that the bullet strikes were knee-high. On cross-examination, Edwards admitted that he did not know how long these marks had been on the building or whether they were even related to this shooting.

{¶ 15} Jeff Conway testified that as he was leaving Dockside on the night of the shooting, a man named Corey started an argument with him, and they began to fight. The two had been on bad terms since high school. During the fight, one of Corey's friends grabbed Jeff and placed him in a headlock. Corey hit Jeff, and then Williams cut Jeff twice across his midsection. Jeff testified that he was "cut open pretty bad" and felt blood running down his stomach.

{¶ 16} After Jeff was cut, he was scared and went to his brother in the parking lot, telling him he had been cut. Jeff then started walking to his car. Before he reached the car, he saw Williams coming at him again. Jeff testified that he had seen that Williams had something in his hand. Jeff testified, "I thought he was coming back to finish me off." He pointed at Williams and yelled, "He's coming at me." Jeff then heard gunshots and saw Williams jump back and pull Gervais in front of him, both falling to the ground.

{¶ 17} On cross-examination, Jeff said that he had not seen who had shot Williams and Gervais. Jeff insisted that he did not know whether his brother was the Dockside shooter and denied ever discussing the shooting with Conway. Jeff could not explain why he did not report the knife attack to the police.

{¶ 18} Conway testified that after the fighting in the parking lot had stopped, Jeff walked up to him and said he had been cut. Jeff lifted his shirt, and Conway could see blood flowing from the wound. Conway thought that Jeff was seriously injured and decided to walk Jeff to his car. As they walked to Jeff's car, Conway stopped to talk with the owner of the bar about the fight.

{¶ 19} Conway then heard Jeff screaming, "There's the guy; that's him." Conway testified that he looked up and saw Williams charging down the sidewalk at Jeff. Conway saw no weapon, but Williams was holding his hand down at his side, and Conway was sure that Williams still had a knife. Conway testified, "[W]hen I seen him coming at my brother, I looked around and Rob's standing right beside me and he has a gun in his hand, so I just snatched it out of his hand and just started shooting at the ground, like trying to cut off where [Williams] was coming from." Conway claimed that he had not been trying to kill Williams

and so shot low, "like at his hip * * * to stop him from getting to [Jeff]." Conway said he was pulling the trigger as fast as he could and did not pause between shots. He claimed that he had had tunnel vision and had not seen Williams pull Gervais into the line of fire. He said he did not realize that he had shot Gervais until he stopped shooting and both Williams and Gervais were lying on the ground.

{¶ 20} Conway testified that when he saw Williams and Gervais on the ground, he was in shock, and his friends quickly pushed him into a car. Conway's first thought was not to go to the police but to make sure Jeff was all right. Conway left the scene with his friends and went to Big Mike's Palace because that was where Jeff had gone.

{¶ 21} On cross-examination, Conway testified that he had never talked about the Dockside shooting with his brother. Conway said he was mad that Jeff had been cut, but that his first concern was his brother and not going after Williams. Conway denied retrieving the gun from the car and did not see Myers remove the gun from the trunk. Conway described the gun as silver, with a gold Colt emblem on the handle. Police seized an empty Colt gun box from his house, but Conway denied owning a Colt handgun. Conway said he did not know what happened to the gun after the shooting. He also could not explain why he fired eight shots and emptied his weapon if he was trying only to stop Williams and not kill him.

{¶ 22} Conway initially denied telling Trent anything about the Dockside shooting, but later admitted discussing details about the Dockside shooting because Trent kept asking for information. Conway denied talking with Trent about killing McWhorter and also denied paying Trent $5,000. Conway also said that it was Trent's idea to make a video staging a false confession.

### *Trial Result*

{¶ 23} The jury convicted Conway of aggravated murder and of having a weapon while under a disability. The trial court mistakenly instructed the jury that the charge in Count 2 was attempted murder instead of attempted aggravated murder, as set forth in the indictment. As a result, the jury found Conway guilty of attempted murder in Count 2. (See discussion of proposition of law ten.) The jury also convicted Conway of the course-of-conduct death-penalty specification and the firearm specifications. After the penalty phase, the trial court sentenced Conway to death for the aggravated murder of Jason Gervais, consistent with the jury's recommendation. The trial court imposed a prison sentence of ten years for Conway's conviction for attempted murder, a three-year sentence for the firearm specification (the court merged the two specifications), and a 12–

month sentence for having a weapon while under a disability, with all terms to be served consecutively.

{¶ 24} Following sentencing, Conway filed a motion for new trial. After an evidentiary hearing, the trial court denied the motion.

{¶ 25} The matter is now before us on a direct appeal from the trial court.

## PRETRIAL ISSUES

### Transferred Intent and Prior Calculation and Design

{¶ 26} In proposition of law ten, Conway claims that he could not be convicted of the aggravated murder of Gervais in Count 1, because Count 2 of the indictment charged only attempted murder (as opposed to attempted aggravated murder) of Williams. Conway submits that the absence of prior calculation and design from Count 2 bars his aggravated-murder conviction because that element could not be transferred to Count 1 under the state's theory that the aggravated-murder charge rested on the doctrine of transferred intent.

{¶ 27} Contrary to Conway's claim, Count 2 of the indictment did in fact charge him with attempted *aggravated* murder of Williams. Although the trial court mistakenly instructed the jury on attempted murder, and not attempted aggravated murder as set forth in Count 2 of the indictment, no prejudicial error resulted. The jury's verdict finding Conway guilty of attempted murder was consistent with the trial court's instructions and with the verdict forms. In addition, we have long held that counts of an indictment are not interdependent and that consistency between verdicts on multiple counts of an indictment is unnecessary. *State v. Adams* (1978), 53 Ohio St.2d 223, 7 O.O.3d 393, 374 N.E.2d 137, paragraph two of the syllabus.

{¶ 28} We also find no merit to Conway's contention that the jury failed to make the factual determination as to the existence of prior calculation and design. The trial court correctly instructed the jury on the elements of aggravated murder.

{¶ 29} Thus, we reject Conway's claim that the aggravated-murder conviction was improper because of any perceived inconsistencies between the counts charged in the indictment or in the jury's verdicts on Counts 1 and 2. Therefore, we overrule proposition of law ten.

### Voir Dire

{¶ 30} In his eighth proposition of law, Conway claims that the trial court's use of the word "recommendation" throughout voir dire deprived him of a fair trial. We conclude that there was no error.

{¶ 31} The trial court's references to the jury's penalty determination as a "recommendation" accurately reflected Ohio law, R.C. 2929.03(D), and were not made in a way that would diminish the jury's sense of responsibility in voting for the death penalty. In fact, in the penalty phase, the trial court instructed that it was the jury's "duty to determine the appropriate sentence for the Defendant in this case." Therefore, we overrule Conway's eighth proposition of law.

{¶ 32} Conway contends in his 14th proposition of law that error occurred during voir dire when prospective jurors were not questioned about racial bias. Conway claims that because racial issues permeated his entire case, the trial court was constitutionally required to question prospective jurors on racial prejudice.

{¶ 33} Conway relies primarily on *Turner v. Murray* (1986), 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27. In *Turner,* the Supreme Court held that a "capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." Id. at 36–37, 106 S.Ct. 1683, 90 L.Ed.2d 27. However, the court further held that "a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry." Id. at 37, 106 S.Ct. 1683, 90 L.Ed.2d 27. The *Turner* court noted that the actual decision to question on racial prejudice is a choice best left to a capital defendant's counsel. If defendant's counsel declines to request voir dire on the subject of racial prejudice, the trial court need not broach the topic sua sponte. Id. at 37, 106 S.Ct. 1683, 90 L.Ed.2d 27, fn. 10; *State v. Watson* (1991), 61 Ohio St.3d 1, 13, 572 N.E.2d 97.

{¶ 34} Conway never sought to question prospective jurors about racial bias. Thus, the trial court did not commit error in failing to inquire on the subject. Therefore, we reject Conway's 14th proposition of law.

## GUILT–PHASE ISSUES

### *Sufficiency of Evidence*

{¶ 35} In proposition of law two, Conway argues that his conviction for aggravated murder was not supported by sufficient evidence. Specifically, Conway contends that the state failed to prove the element of prior calculation and design, as R.C. 2903.01(A) requires.

{¶ 36} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S.

307, 99 S.Ct. 2781, 61 L.Ed.2d 560. The weight to be given the evidence and the credibility of witnesses are primarily jury issues. *State v. Waddy* (1992), 63 Ohio St.3d 424, 430, 588 N.E.2d 819; *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212.

{¶ 37} Conway was convicted of one count of aggravated murder under R.C. 2903.01(A), which states: "No person shall purposely, and with prior calculation and design, cause the death of another * * *."

{¶ 38} Although the Revised Code does not define "prior calculation and design," we have interpreted the phrase to require evidence of "more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill." *State v. Cotton* (1978), 56 Ohio St.2d 8, 11, 10 O.O.3d 4, 381 N.E.2d 190. While " '[n]either the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves,' " momentary deliberation is insufficient. *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 196, 616 N.E.2d 909, quoting the 1973 Legislative Service Commission Comment to R.C. 2903.01.

{¶ 39} Nevertheless, where the evidence presented at trial "reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *State v. Cotton*, 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, paragraph three of the syllabus.

{¶ 40} Evidence was presented at trial that as Dockside closed for business in the early morning hours of January 19, 2002, a fight broke out in the parking lot between Conway's group and a group including Mandel Williams. During the altercation, Williams cut Conway's brother, Jeff, with a knife. Jeff told his brother that he had been cut and identified Williams as the person who had cut him.

{¶ 41} At that point, some witnesses recalled hearing someone say, "I'm going to get my gun." Conway and Rob Myers went to a parked car just east of the club's entrance, and Myers retrieved a .45–caliber semiautomatic handgun from the trunk. Either Conway or Myers cleared a round from the gun and chambered a live round to make sure the gun was loaded. One witness testified that when Conway took the gun from Myers, Conway said, "I'll kill you guys."

{¶ 42} Conway then moved rapidly through the parking lot toward Williams and began shooting at Williams from a distance of approximately 30 feet. After Conway's first shot struck Williams in the shoulder, Williams either grabbed Jason Gervais or they accidentally became entangled, and both Williams and Gervais fell to the ground as Conway continued to fire as he advanced toward

them. Conway emptied his weapon into Williams and Gervais while they lay on the ground. By the time the last shots were fired, Conway was within eight feet of Williams and Gervais. According to Trent, Conway later told Trent that although Gervais was in the line of fire, he kept shooting because he had a .45 "and it would go through him [Gervais]."

{¶ 43} Construing the evidence in a light most favorable to the prosecution, any rational juror could have concluded beyond a reasonable doubt that Conway had formulated a plan to kill Williams in retaliation for Jeff Conway's injury. After discovering that his brother had been cut, Conway announced his intention to get his gun and kill. After Jeff pointed out Williams as his attacker, Conway obtained and readied his weapon, fired shots while advancing toward Williams, and continued to shoot after Williams and Gervais lay wounded on the ground. Conway's plan was to shoot and kill Williams. He never abandoned his scheme, even after Gervais entered his line of fire.

{¶ 44} That Conway killed Gervais instead of his intended victim, Williams, does not prevent a finding by the jury of prior calculation and design. "If one purposely causes the death of another and the death is the result of a scheme designed to implement the calculated decision to kill someone other than the victim, the offender is guilty of aggravated murder in violation of R.C. 2903.01(A)." State v. Solomon (1981), 66 Ohio St.2d 214, 20 O.O.3d 213, 421 N.E.2d 139, paragraph one of the syllabus.

{¶ 45} We have previously held that a defendant's threat to obtain a weapon and kill his victim and his later actions carrying out the threat are enough to prove prior calculation and design. State v. Sowell (1988), 39 Ohio St.3d 322, 333, 530 N.E.2d 1294; see, also, State v. Toth (1977), 52 Ohio St.2d 206, 213, 6 O.O.3d 461, 371 N.E.2d 831; State v. Cassano, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 80–84. Pursuit of a wounded, helpless victim also has been held to be evidence of prior calculation and design. See, e.g., State v. Robbins (1979), 58 Ohio St.2d 74, 78–79, 12 O.O.3d 84, 388 N.E.2d 755 (defendant obtained a weapon from his apartment after fighting with victim in hallway, returned to hallway, and stabbed wounded, helpless victim to death); State v. Claytor (1991), 61 Ohio St.3d 234, 241, 574 N.E.2d 472 (defendant pursued wounded victim and shot him in the face); State v. Cotton, 56 Ohio St.2d at 9–10, 10 O.O.3d 4, 381 N.E.2d 190 (defendant wounded first police officer and, after shooting second officer, returned to kill first officer, who was trying to crawl away).

{¶ 46} We also find that there was sufficient time for Conway to formulate a plan to kill Williams. Damien LeCaptain, head of security for Dockside, testified that one and a half to two minutes passed between the time that Williams cut Conway's brother and the time that Conway went to retrieve the gun from the car. Paris Long, a bouncer at the club, testified that from the time that Jeff said

he was cut, two to two and half minutes passed until the first shots were fired. Finally, Michael Small, the floor manager at Dockside, testified that in the length of time between Jeff's saying that he was cut and shots being fired, Small was able to help an injured security guard from the parking lot to the front door of the bar, unlock the door, take the guard inside, and start walking back to the parking lot. Although they took only a few minutes, Conway's actions went beyond a momentary impulse and show that he was determined to complete a specific course of action. Such facts show that he had adopted a plan to kill. See *State v. Claytor*, 61 Ohio St.3d at 241, 574 N.E.2d 472; *State v. D'Ambrosio*, 67 Ohio St.3d at 196, 616 N.E.2d 909.

{¶ 47} Furthermore, Conway's confession to Trent, the government informant, essentially mirrors the evidence of prior calculation and design found in the eyewitness testimony. According to Trent, Conway told him that after Jeff was cut, Conway had Myers get a gun from the car and asked Jeff to point out the man who had cut him. Conway said that after Jeff identified Williams, he cocked the gun to make sure it was loaded and when a live round fell out, cocked it again. Conway then started shooting at Williams, whom Conway described as running away from him.

{¶ 48} When viewed in a light most favorable to the state, this evidence was sufficient to show that Conway had adopted a plan to kill Williams upon discovering that Williams had cut his brother and that Conway had carried out his plan. Therefore, we reject Conway's second proposition of law.

### Defendant's Absence from Jury–Instruction Conference

{¶ 49} Conway argues in proposition of law three that the trial court violated his right to a fair trial by conducting critical stages of the trial outside his presence. Conway complains that he was not present for two conferences when proposed guilt-phase jury instructions were discussed.

{¶ 50} An accused has a fundamental right to be present at all critical stages of his criminal trial. Section 10, Article I, Ohio Constitution; Crim.R. 43(A). An accused's absence, however, does not result in prejudicial or constitutional error unless "a fair and just hearing would be thwarted by [defendant's] absence." *Snyder v. Massachusetts* (1934), 291 U.S. 97, 107–108, 54 S.Ct. 330, 78 L.Ed. 674. In *United States v. Gagnon* (1985), 470 U.S. 522, 527, 105 S.Ct. 1482, 84 L.E.2d 486, the Supreme Court held that, in certain circumstances, a defendant's absence from a discussion at which his counsel are present does not offend due process. See, also, e.g., *State v. Williams* (1983), 6 Ohio St.3d 281, 285–286, 6 OBR 345, 452 N.E.2d 1323 (defendant's absence from in camera voir dire of allegedly tainted jurors was harmless error).

{¶ 51} The conference on jury instructions was held on January 29 and was continued on January 30, 2003. On January 29, before the conference began, the trial judge announced in open court that the parties would be meeting that afternoon to discuss the guilt-phase jury charge. No objection to Conway's absence was raised until February 5, 2003, just before the start of the penalty phase. Conway's failure to timely object constituted a waiver of his right to be present. *State v. Palmer* (1997), 80 Ohio St.3d 543, 559, 687 N.E.2d 685.

{¶ 52} We rejected the same argument in *State v. White* (1998), 82 Ohio St.3d 16, 26, 693 N.E.2d 772, finding that defendant's absence during a hearing on proposed jury instructions did not deprive him of a fair trial. Other than claiming that he would have provided "invaluable" assistance to his counsel, Conway does not advance any argument that his absence prevented a fair trial. Therefore, we overrule proposition of law three.

## Administration of Oath to Jury

{¶ 53} In his sixth proposition of law, Conway maintains that the trial court's having the bailiff, rather than the clerk of the common pleas court, administer the oath to the jurors, as R.C. 2945.28 directs, was prejudicial. R.C. 2945.28 provides, "In criminal cases jurors and the jury shall take the following oath to be administered by the trial court or the clerk of the court of common pleas * * *."

{¶ 54} After the jury was selected, the trial judge directed his bailiff to administer the oath to the members of the jury and the alternate jurors. Conway, however, did not object to the bailiff's administering the oath and has waived all but plain error. See Crim.R. 52(B); *State v. Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240. Conway presented no evidence demonstrating that he was prejudiced by the failure of the trial court or clerk to administer the oath. Without a showing of prejudice, the trial court's failure to strictly comply with R.C. 2945.28 does not require reversal of the jury's verdict. See, e.g., *State v. Boykin*, Montgomery App. No. 19896, 2004-Ohio-1701, 2004 WL 690799, at ¶ 159–166; *State v. Vanblarcome*, Franklin App. No. 02AP–417, 2003-Ohio-579, 2003 WL 257408, at ¶ 6–22. See, also, *State v. Glaros* (1960), 170 Ohio St. 471, 11 O.O.2d 215, 166 N.E.2d 379.

{¶ 55} Conway's contention that the trial court committed structural error in this regard is equally without merit. The "trial-error/structural-error distinction is irrelevant unless it is first established that *constitutional* error has occurred." (Emphasis sic.) *State v. Esparza* (1996), 74 Ohio St.3d 660, 662, 660 N.E.2d 1194. See, also, *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, at ¶ 23 (cautioning against applying a structural-error analysis in a plain-error situation). Any error here was, at most, a statutory violation and not a constitutional error. Thus, we overrule Conway's sixth proposition of law.

224

*Government Agent*

{¶ 56} In propositions of law 12 and 13, Conway contends that the trial court admitted evidence at trial in violation of his Sixth Amendment right to counsel. Conway complains about evidence obtained by Ronald Trent, a government informant, after Conway was indicted in this matter.

{¶ 57} The following facts are relevant to the issues raised in propositions 12 and 13. Conway was arrested on February 23, 2002, in connection with the Dockside shooting and was jailed in the same cellblock as Trent. Trent had been in jail for six months before Conway's arrest, and Conway and Trent had not previously known each other. On March 5, 2002, Conway was indicted for the Dockside shooting.

{¶ 58} Approximately two weeks after he was arrested, Conway discovered that Trent was a distant cousin. Later, Conway confided to Trent that he was the Dockside shooter. Conway also attempted to enlist Trent to kill a witness to the Dockside shooting and to stage a false confession by coercing someone else to admit on videotape to the Dockside shooting. Conway promised Trent $30,000 for killing a witness and arranged for $5,000 to be deposited in Trent's jail commissary account as an advance payment.

{¶ 59} On April 4, 2002, Trent wrote a letter to a prosecutor in the Dockside-shooting case, informing her that he had information regarding Conway's involvement in the shooting. Trent wrote her a second letter, dated April 10, 2002, reiterating that Conway was involved in the Dockside shooting and added that Conway had offered a contract to kill a witness testifying against him.

{¶ 60} On April 25, 2002, sheriff's detectives interviewed Trent. During this interview, Trent provided information about the Dockside shooting, Conway's plan to murder a witness, and his intent to manufacture evidence by staging a false confession. Trent and law-enforcement officials also discussed a plan to record Trent's conversations with Conway.

{¶ 61} On May 16, 2002, the state placed Trent on work release from jail, and he began working with the Franklin County Sheriff's Office in its investigation of Conway. Between May 17 and May 24, 2002, a series of conversations was recorded in which Trent and Conway talked about Conway's plans to kill a witness and stage a false confession.

{¶ 62} Before trial, Conway moved to suppress the evidence collected by Trent. After a hearing, the trial court denied the motion. During the state's case-in-chief, Trent testified on direct examination about his conversations with Conway that occurred both before and after he began working with sheriff's detectives. In addition, the state was permitted to cross-examine Conway about his recorded conversations with Trent after Trent became a confidential informant.

{¶ 63} Conway claims in proposition of law 13 that evidence gathered by Trent after he became an informant on May 16, 2002, was introduced during the prosecutor's case-in-chief in violation of the Sixth Amendment.

{¶ 64} The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence." In *McNeil v. Wisconsin* (1991), 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158, the Supreme Court explained that this right to counsel is offense-specific. "It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, ' "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." ' " Id. at 175, 111 S.Ct. 2204, 115 L.Ed.2d 158, quoting *United States v. Gouveia* (1984), 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146, quoting *Kirby v. Illinois* (1972), 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411.

{¶ 65} In a line of cases involving incriminating statements made to police informants, the United States Supreme Court has held that an accused who stands indicted of a crime is denied the basic protections of the Sixth Amendment "when there [is] used against him at his trial evidence of his own incriminating words" that government agents "deliberately elicited" from him in the absence of his counsel. *Massiah v. United States* (1964), 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246; *United States v. Henry* (1980), 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115; *Maine v. Moulton* (1985), 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481. Cf. *Kuhlmann v. Wilson* (1986), 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (no Sixth Amendment violation unless the defendant shows that police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks). See, also, *Patterson v. Illinois* (1988), 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (the Sixth Amendment does not bar postindictment questioning in the absence of counsel if the accused waives the right to counsel).

{¶ 66} The deliberate-elicitation standard was first recognized in *Massiah*. In that case, Massiah, released on bail, made numerous incriminating statements to a coindictee who was acting as a government informant and using a surveillance device. The court held that the protections of the Sixth Amendment apply to " 'indirect and surreptitious interrogations' " as well as those conducted at the police station. *Massiah*, 377 U.S. at 206, 84 S.Ct. 1199, 12 L.Ed.2d 246, quoting a dissenter from a court of appeals' decision, *United States v. Massiah* (C.A.2, 1962), 307 F.2d 62, 72 (Hays, J., dissenting). Accordingly, the court held that the prosecutor could not constitutionally use Massiah's incriminating statements, because federal agents had deliberately elicited those statements after Massiah

had been indicted and in the absence of his counsel. Id. at 206–207, 84 S.Ct. 1199, 12 L.Ed.2d 246.

{¶ 67} In *Henry,* an accused made postindictment incriminating statements to a government informant while both were in custody. The court applied *Massiah*'s deliberate-elicitation standard and held that "[b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." *Henry,* 447 U.S. at 274, 100 S.Ct. 2183, 65 L.Ed.2d 115. The court noted that the informant "was not a passive listener; rather, he had 'some conversations with Mr. Henry' * * * and Henry's incriminating statements were 'the product of this conversation.' " Id. at 271, 100 S.Ct. 2183, 65 L.Ed.2d 115, quoting the informant's testimony.

{¶ 68} The court also found a Sixth Amendment violation in *Moulton,* where incriminating statements were obtained by Moulton's codefendant, who secretly transmitted or recorded conversations with Moulton after both had been released on bail pending trial. The codefendant obtained several incriminating statements by professing to have a poor memory and asking Moulton to remind him of the circumstances of the crimes and by reminiscing about events surrounding various thefts. The court invoked *Massiah* and *Henry* and articulated the following principle:

{¶ 69} "[K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." By arranging to record conversations between Moulton and the informant and concealing the fact that the informant was an agent of the state, the court found, the police denied Moulton an opportunity to consult with counsel and thus had denied him the assistance of counsel guaranteed by the Sixth Amendment. Id. at 177, 106 S.Ct. 477, 88 L.Ed.2d 481.

{¶ 70} *Massiah, Henry,* and *Moulton* all rest squarely on the prohibition against interference with the right to counsel. The nature of the right recognized in these cases is that the "Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State." *Moulton,* 474 U.S. at 176, 106 S.Ct. 477, 88 L.Ed.2d 481. "[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann v. Wilson,* 477 U.S. at 459, 106 S.Ct. 2616, 91 L.Ed.2d 364. Once an accused is charged, he may not be interrogated, either directly or indirectly, about the subject matter of those charges unless counsel is present.

{¶ 71} In this case, Conway's Sixth Amendment right to counsel had attached regarding the Dockside-shooting prosecution when he was indicted on March 5, 2002. The state concedes that Trent became an agent for the state on May 16, 2002, and Conway does not argue on appeal that Trent became a government agent before then.

{¶ 72} The state does not deny that law-enforcement officials used Trent as a government informant to deliberately elicit incriminating statements from Conway after he was indicted for the Dockside shooting. Instead, the state contends that because the incriminating statements concerned crimes unrelated to the Dockside shooting with which Conway had not yet been charged, Conway's Sixth Amendment right to counsel was not violated. The state claims that from May 16, 2002, when Trent began working with sheriff's detectives, Trent elicited incriminating evidence regarding only criminal acts that Conway had not yet been charged with committing.

{¶ 73} Contrary to the state's assertion, the record demonstrates that Trent did deliberately draw out incriminating evidence from Conway relating to the Dockside shooting after he became a government informant. After becoming a state agent, Trent recorded statements about Conway's desire to kill a witness to the Dockside shooting and elicited evidence about Conway's plan to manufacture evidence by staging a false, videotaped confession. This evidence was incriminating on the pending Dockside charges as well as on potential future charges (conspiracy to commit murder and tampering with evidence).

{¶ 74} The state wishes to limit the Sixth Amendment right to counsel to only direct statements by the accused about the indicted offense. Nothing in *Massiah* or its progeny, however, supports this limitation. Moulton's government informant surreptitiously transmitted or recorded postindictment conversations during which Moulton recounted his part in the charged offenses and discussed eliminating witnesses and creating a false alibi. The prosecutor was allowed to admit at trial the incriminating statements about Moulton's participation in the indicted theft offenses as well as the false-alibi plan. *Moulton*, 474 U.S. at 167, 106 S.Ct. 477, 88 L.Ed.2d 481. The Supreme Court held that "incriminating statements *pertaining to pending charges* are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel." (Emphasis added.) Id. at 180, 106 S.Ct. 477, 88 L.Ed.2d 481.

{¶ 75} The court of appeals in *United States v. Bender* (C.A.1, 2000), 221 F.3d 265, rejected an argument similar to the state's argument here. Bender, while in prison awaiting trial on charges of being a felon in possession of a firearm, spoke with an undercover government agent about his plans to falsify an alibi and

kidnap and murder prosecution witnesses. The First Circuit rejected the government's argument that the statements concerned unindicted crimes unrelated to the pending firearm charges and were not obtained in violation of the Sixth Amendment. The court found that it was obvious that questioning Bender about the false alibi and the plot to kill witnesses would lead to incriminating statements on the indicted firearm charges. Id. at 269. While Bender's statements about his plans to kill witnesses and suborn perjury did not provide direct evidence of the pending charges or amount to an explicit confession, "they 'strongly tended to show that a guilty mind was at work.'" Id. at 269, quoting *United States v. Lozada–Rivera* (C.A.1, 1999), 177 F.3d 98, 107.

{¶ 76} That same analysis applies here. Conway's statements to Trent concerning his intention to kill a witness and to manufacture evidence were material evidence of Conway's guilty mind involving the Dockside charges.

{¶ 77} Although the police have a legitimate interest in investigating new or additional crimes, the state's "investigative powers are limited by the Sixth Amendment rights of the accused." *Moulton,* 474 U.S. at 180, 106 S.Ct. 477, 88 L.Ed.2d 481. The right to counsel under the Sixth Amendment is violated when the state's agent engages the accused in conversation designed to uncover incriminating information about the charges pending against him. See id. at 177, 106 S.Ct. 477, 88 L.Ed.2d 481. Accordingly, the Sixth Amendment bars the prosecution from using evidence in its case-in-chief that Trent had obtained from Conway after becoming a state agent on May 16, 2002. Because Trent's direct testimony during the state's case presented this evidence, we find that Conway's Sixth Amendment right to counsel was violated.

{¶ 78} Nevertheless, our finding does not require an automatic reversal. A constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705. Whether a Sixth Amendment error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. Id. at 23, 87 S.Ct. 824, 17 L.Ed.2d 705; *State v. Madrigal* (2000), 87 Ohio St.3d 378, 388, 721 N.E.2d 52. For the following reasons, we conclude that the admission of this evidence during the prosecution's case-in-chief was harmless beyond a reasonable doubt.

{¶ 79} First, the evidence erroneously admitted was largely cumulative of evidence that Trent had obtained before becoming a state agent. That is, before May 16, 2002, when Trent agreed with the prosecutor's office to act as a government informant, Conway had already admitted to Trent that he was the Dockside shooter, that he wanted to murder a witness to the Dockside shooting,

and that he planned to manufacture evidence for the Dockside case by staging a false, videotaped confession. In addition, by April 9, more than one month before Trent became a state agent, Conway had $5,000 placed in Trent's jail commissary account as a down payment for killing a government witness.

{¶ 80} Any statements that Conway made to Trent before Trent became a government informant did not violate Conway's right to counsel and were properly admitted during the state's case. "[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Moulton*, 474 U.S. at 176, 106 S.Ct. 477, 88 L.Ed.2d 481, citing *Henry*, 447 U.S. at 276, 100 S.Ct. 2183, 65 L.Ed.2d 115 (Powell, J., concurring). The record reflects that Conway trusted Trent because they were cousins and that Conway's statements during their joint incarceration were voluntarily made.

{¶ 81} The only evidence obtained in violation of Conway's right to counsel that was not uncovered by Trent before he became a state agent involved discussions about Trent's having carried out the plan to make a videotaped confession and kill the person who made the confession. Nonetheless, Conway had already discussed with Trent his plot to kidnap someone who resembled himself, make a video of this person's confession to the Dockside shooting, and then kill that person. In fact, before Trent became a state agent, Conway had instructed Trent on specific details to include in the video. For instance, Conway reminded Trent to include a reference in the video to the live bullet found at the crime scene, which had been ejected when Conway or Myers was making sure that the gun was loaded. Conway also urged Trent to use Randy Price in the video because Price resembled Conway. Thus, although evidence of Conway and Trent's discussions after the videotape had been made and the confessor had purportedly been killed should not have been admitted during the state's case, Conway was not prejudiced, because evidence was properly admitted at trial that Conway had plotted to make the false, videotaped confession with Trent before Trent became an agent.

{¶ 82} Second, the question of Conway's guilt is not close in this case. Strong evidence exists, including eyewitness testimony, that Conway retrieved a loaded gun from a car, pursued Williams through the Dockside parking lot, and fired eight shots at his victims—including shots from close range while Williams and Gervais lay defenseless on the ground. Conway also testified during trial that he had shot Williams and Gervais.

{¶ 83} Because the tainted evidence simply repeated properly admitted evidence and the state's case against Conway was so strong, we hold that the error here was harmless beyond a reasonable doubt. Therefore, we overrule Conway's 13th proposition of law.

230

{¶ 84} In proposition of law 12, Conway contends that his Sixth Amendment right to counsel was violated when the trial court allowed the prosecutor to cross-examine him about the recorded conversations he had with Trent after May 16, 2002.

{¶ 85} During cross-examination, Conway first denied telling Trent anything about the Dockside shooting or talking with him about killing a witness. He testified that staging the false confession was Trent's idea. The prosecutor then attempted to impeach Conway by referring to recorded conversations between Trent and Conway that occurred after Trent became a state agent on May 16.

{¶ 86} On cross-examination, Conway claimed that his attorneys had not provided him with the Trent tapes before trial, although he did admit to having read through some transcripts of those recorded conversations. The trial court allowed the prosecutor to question Conway outside the presence of the jury in order to give Conway an opportunity to listen to the tapes and to compare them with the transcripts. After that, the prosecutor was allowed to cross-examine Conway about the tape-recorded conversations. Neither the tape recordings nor the transcripts were admitted into evidence.

{¶ 87} Conway argues that the trial court committed prejudicial error when it allowed the prosecutor to impeach him by using statements obtained in violation of his Sixth Amendment right to counsel. In *State v. Hill* (1996), 75 Ohio St.3d 195, 661 N.E.2d 1068, we considered whether a defendant's pretrial statements made during a court-ordered psychiatric interview could be used to impeach his trial testimony. Hill claimed on appeal that the statements were inadmissible because his counsel was not present during the psychiatric interview and he was not advised of his *Miranda* rights. We recognized that "an accused's voluntary statement could be used to impeach even when the statement was taken in violation of the right to have counsel present." Id. at 207, 661 N.E.2d 1068, citing *Michigan v. Harvey* (1990), 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293.

{¶ 88} *Harvey* held that a statement taken in violation of *Michigan v. Jackson* (1986), 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631, while inadmissible during the prosecution's case-in-chief, may be used to impeach a defendant's trial testimony. *Harvey*, 494 U.S. at 349–352, 110 S.Ct. 1176, 108 L.Ed.2d 293. Several federal circuit courts of appeals have, as we did in *Hill*, construed *Harvey* as holding that a voluntary statement taken in violation of the Sixth Amendment right to counsel is admissible for impeachment purposes. *United States v. Ortega* (C.A.9, 2000), 203 F.3d 675, 681; *United States v. Yancey* (C.A.4, 1998), 155 F.3d 564 (unpublished opinion); *United States v. Bender*, 221 F.3d at 271; *United States v. Fellers* (C.A.8, 2005), 397 F.3d 1090, 1097; *United States v. Denetclaw* (C.A.10, 1996), 96 F.3d 454, 457. But, see, *United States v. Spencer* (C.A.2, 1992), 955 F.2d 814 (reading *Harvey* narrowly and holding that statements taken in violation

of an accused's Sixth Amendment right to counsel are inadmissible for all purposes, absent a valid waiver); *United States v. Abdi* (C.A.2, 1998), 142 F.3d 566 (following *Spencer* ).

{¶ 89} The rationale employed by *Harvey*, and adopted by this court in *Hill*, is that a defendant should not be allowed to " ' "turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths." ' " *Harvey*, 494 U.S. at 351, 110 S.Ct. 1176, 108 L.Ed.2d 293, quoting *Harris v. New York* (1971), 401 U.S. 222, 224, 91 S.Ct. 643, 28 L.Ed.2d 1, quoting *Walder v. United States* (1954), 347 U.S. 62, 65, 74 S.Ct. 354, 98 L.Ed. 503. "If a defendant exercises his right to testify on his own behalf, he assumes a reciprocal 'obligation to speak truthfully and accurately.' " Id., quoting *Harris*, 401 U.S. at 225, 91 S.Ct. 643, 28 L.Ed.2d 1.

{¶ 90} On this basis, we hold that Conway's recorded statements to Trent, although obtained in violation of his Sixth Amendment right to counsel, were admissible solely to impeach his untruthful trial testimony. Therefore, we deny proposition of law 12.

### Denial of Counsel

{¶ 91} Conway claims in proposition of law 16 that the trial court committed constitutional error when it ordered Conway not to discuss his testimony with counsel during an overnight recess. During the state's cross-examination of Conway, the trial court decided to recess for the day. After the jury was excused, the trial court instructed Conway:

{¶ 92} "Mr. Conway, you can leave the stand. You're not to discuss your testimony with anybody till you resume the stand, you're in the middle of examination."

{¶ 93} At the time, defense counsel did not object to the trial court's admonition. The following morning, defense counsel stated, "I object to the separation order of the Court last night on the basis that I was not to see my client last night or to talk about this case." The trial court explained that it did not order counsel not to visit or consult with their client but, rather, that Conway was not to discuss his testimony with anyone until his examination was completed. Defense counsel made no further objection at that point. Conway raised the issue again in his motion for new trial. After an evidentiary hearing, the trial court again rejected Conway's claim.

{¶ 94} On appeal, Conway maintains that *Geders v. United States* (1976), 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592, and *Perry v. Leeke* (1989), 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624, demonstrate that the trial court committed

constitutional error when it ordered Conway not to discuss his testimony with counsel. We find that neither case supports Conway's claim.

{¶ 95} *Geders* held that a defendant's Sixth Amendment right to counsel was infringed when the trial court prevented him from consulting with counsel "about anything" during an overnight recess. *Geders*, 425 U.S. at 91, 96 S.Ct. 1330, 47 L.Ed.2d 592. Thus, *Geders* concerned a complete deprivation of access to counsel. This matter is not analogous to *Geders* because the trial court did not restrict Conway's access to his lawyers during the overnight recess.

{¶ 96} *Perry* held that a defendant has no constitutional right to consult with his attorney about his testimony while testifying. *Perry*, 488 U.S. at 284–285, 109 S.Ct. 594, 102 L.Ed.2d 624. The court found that while a defendant has an absolute right to consultation before he begins to testify, a trial judge can decide that cross-examination is more likely to elicit truthful responses if it goes forward without allowing the defendant an opportunity to consult with his or her attorney. Id. at 281–282, 109 S.Ct. 594, 102 L.Ed.2d 624.

{¶ 97} Admittedly, *Perry* involved a decidedly brief recess—15 minutes—as opposed to the overnight recess at issue here. Nevertheless, *Geders* and *Perry* made clear that "[i]t is the defendant's right to unrestricted access to his lawyer for advice on a variety of trial-related matters that is controlling in the context of a long recess." *Perry*, 488 U.S. at 284, 109 S.Ct. 594, 102 L.E.2d 624, citing *Geders*, 425 U.S. at 88, 96 S.Ct. 1330, 47 L.Ed.2d 592. Although Conway was prohibited from discussing his uncompleted testimony with counsel, the trial court did not order him not to meet or consult with counsel about other matters during the overnight recess. See *Perry*, U.S. at 284, 109 S.Ct. 594, 102 L.Ed.2d 624, fn. 8, citing with approval *People v. Stroner* (1982), 104 Ill.App.3d 1, 5–6, 59 Ill.Dec. 764, 432 N.E.2d 348. Therefore, we deny Conway's 16th proposition of law.

### Right to Public Trial

{¶ 98} In proposition of law 17, Conway contends that the government intruded on his right to a public trial. Conway's claim is devoid of merit.

{¶ 99} The Sixth Amendment provides that a defendant "shall enjoy the right to a speedy and public trial." We have "long recognized that 'the right to a public trial * * * is a fundamental guarantee of both the United States and Ohio Constitutions.'" *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 62, quoting *State v. Lane* (1979), 60 Ohio St.2d 112, 14 O.O.3d 342, 397 N.E.2d 1338, paragraph two of the syllabus. In *Waller v. Georgia* (1984), 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31, the Supreme Court addressed the scope of a criminal defendant's right to a public trial. The court noted that the central aim of a criminal proceeding is to try the accused fairly and recognized that the

public-trial guarantee allows the public to see for itself that the accused is fairly dealt with and not unjustly condemned. In addition, a public trial ensures that the judge and prosecutor carry out their duties responsibly, encourages witnesses to come forward, and discourages perjury. Id. at 46, 104 S.Ct. 2210, 81 L.Ed.2d 31.

{¶ 100} *Waller* dealt with a trial court's barring from a suppression hearing all persons other than the parties, their lawyers, witnesses, and court personnel. *Waller*, 467 U.S. at 42, 104 S.Ct. 2210, 81 L.Ed.2d 31. Conway concedes that the trial judge did not order any part of his trial closed to the public. Nevertheless, Conway maintains that the prosecutor interfered with his right to a public trial. While Conway's argument is somewhat difficult to decipher, he apparently contends that prosecutors prevented certain people from attending his trial.

{¶ 101} Yet there is no credible evidence to support Conway's claim. The only restrictions imposed on spectators entering the courtroom related to enforcing the court's separation-of-witnesses order, an order that defense counsel requested. See Evid.R. 615. Sheriff's deputies were placed at the courtroom entrance for security purposes, and spectators were asked to show identification before entering the courtroom. Defense counsel and the prosecuting attorneys conferred with deputies, as well as with each other, to determine whether certain spectators were potential witnesses and should be excluded from the courtroom.

{¶ 102} Conway's claim that prosecutors intimidated spectators who supported Conway is equally without merit. In his brief, Conway refers to Gretchen Roese and Susan Doering as subjects of the alleged improper government conduct. An evidentiary hearing on this issue was held in conjunction with Conway's motion for a new trial, at which both women testified that they had not been prevented from attending Conway's trial. Roese and Doering testified that they had been required to present identification before entering the courtroom, but conceded that this request was made after they had refused to reveal their names to deputies. Both were informed that the prosecutors were merely trying to identify potential witnesses. Each was questioned by prosecuting attorneys, but only because each agreed to talk to them. Therefore, there is no evidence that either woman was singled out or intimidated, and Conway has not established that his right to a public trial was violated.

{¶ 103} In any event, Conway did not complain until after the guilt phase of his trial that his family and friends were intimidated or barred from the courtroom. Thus, this issue has been waived. See Crim.R. 52(B); *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph one of the syllabus.

{¶ 104} Thus, we reject his 17th proposition of law.

### Testimony of Former Assistant Prosecutor

{¶ 105} Conway argues in proposition of law 18 that prejudicial error occurred when a former assistant prosecuting attorney, previously active in his case, was allowed to testify. During the state's case, the prosecutor called a former assistant prosecutor, David DeVillers, to rebut an implication by defense counsel that the government's informant, Trent, had gained information about the Dockside shooting from reading Conway's discovery documents during their joint incarceration. Conway did not object to DeVillers's testimony at trial and has waived all but plain error. Plain error will not be found unless Conway establishes that the outcome of his trial clearly would have been otherwise except for the trial court's alleged improper action of allowing the testimony. *State v. Waddell* (1996), 75 Ohio St.3d 163, 166, 661 N.E.2d 1043.

{¶ 106} Prosecuting attorneys are not disqualified as witnesses solely by virtue of their employment in cases in which they play no other role. *United States v. Armedo–Sarmiento* (C.A.2, 1976), 545 F.2d 785, 793. See, also, *State v. Daniels* (1993), 92 Ohio App.3d 473, 488, 636 N.E.2d 336 (testimony of juvenile-division assistant prosecutor allowed because he was not engaged as active counsel for prosecution). In *State v. Coleman* (1989), 45 Ohio St.3d 298, 544 N.E.2d 622, paragraph two of the syllabus, we held, "A prosecuting attorney should avoid being a witness in a criminal prosecution, but where it is a complex proceeding and substitution of counsel is impractical, and where the attorney so testifying is not engaged in the active trial of the cause and it is the only testimony available, such testimony is admissible and not in violation of DR 5–102." See, also, *United States v. Johnston* (C.A.7, 1982), 690 F.2d 638, 644 (prosecutor's testimony may be permitted in extraordinary circumstances and for compelling reasons, usually where the evidence is otherwise unavailable).

{¶ 107} Conway relies primarily on *Coleman* and *Johnston* in support of this proposition. But this is not a case in which DeVillers was engaged in the dual role of advocate-witness. Cf. *United States v. Johnston*, 690 F.2d at 642 (the advocate-witness rule "articulates the professional impropriety of assuming the dual role of advocate and witness in a single proceeding"). DeVillers participated in the criminal investigation of Conway and presented the Dockside shooting to the grand jury, but did not act as counsel for the state during Conway's trial.

{¶ 108} Although Conway contends that the information in DeVillers's testimony was available through a stipulated exhibit, DeVillers's testimony was probative of whether Trent could have gained any knowledge about Conway's involvement in the Dockside shooting from discovery materials in Conway's cell. See Evid.R. 401 and 402.

{¶ 109} Thus, there was no error, plain or otherwise.. DeVillers had no other role at Conway's trial beyond his testimony, and his testimony was relevant. Therefore, we overrule Conway's 18th proposition of law.

### Denial of Expert Witness and Limitation on Cross–Examination

{¶ 110} In proposition of law 21, Conway argues that the trial court erred when it did not allow testimony and evidence from James Cope, whom the defense wished to call as an expert witness. He also contends under this proposition that defense counsel were severely limited in their ability to cross-examine Trent, the state's informant.

{¶ 111} *Denial of expert witness.* After the state rested, the defense informed the court that it intended to call Cope, a mechanical engineer, as an expert witness. The defense had hired Cope to make a computer-animated reenactment of the crime. Cope's video purported to show how Williams had pulled Gervais into the line of fire as Conway was shooting at Williams.

{¶ 112} The trial court denied defense counsel's request to call Cope and to introduce the video into evidence. The court also precluded the defense from calling Cope to introduce still photographs produced from the video. The court found that defense counsel had violated pretrial discovery by not providing the state with the video or Cope's curriculum vitae ("CV") or any other documents establishing his credentials until immediately before the defense intended to introduce the evidence. The court also noted that the video did not accurately depict the evidence introduced at trial and indicated that the video might mislead the jury.

{¶ 113} Conway contends on appeal that the trial court severely restricted his right to present a defense by excluding Cope's testimony and the video. However, "[a] party may not predicate error on the exclusion of evidence during the examination in chief unless *two* conditions are met: (1) the exclusion of such evidence must affect a substantial right of the party *and* (2) the substance of the excluded evidence was made known to the court by proffer *or* was apparent from the context within which questions were asked." (Emphasis sic.) *State v. Gilmore* (1986), 28 Ohio St.3d 190, 28 OBR 278, 503 N.E.2d 147, syllabus. Conway has not met either requirement.

{¶ 114} The record is insufficient to support a finding that this evidence was improperly excluded. After the trial court rejected Cope's evidence, defense counsel proffered defense exhibits 34 through 37 (still photos taken from the video), exhibit 38 (video reenactment), and exhibit 39 (Cope's CV). Defense counsel then added:

{¶ 115} "I merely proffer that we have the engineer, James Cope, * * * here outside the courtroom, that he would testify, if permitted, that he analyzed the

coroner's report, talked to the [defense] investigator in this case, * * * and he presented a piece of demonstrative evidence that's on this tape, Defendant's Exhibit 38, and also * * * [exhibits] 34 through 37, which are stills coming from the tape which would demonstrate, if permitted, the testimony of the investigator as to his theory of what happened in this case."

{¶ 116} First, defense counsel did not proffer sufficient information establishing Cope's qualifications as an expert witness. "Evid.R. 702(B) provides that a witness may qualify as an expert by reason of his or her specialized knowledge, skill, experience, training, or education. Neither special education nor certification is necessary to confer expert status upon a witness. The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." *State v. Hartman* (2001), 93 Ohio St.3d 274, 285, 754 N.E.2d 1150.

{¶ 117} The only information in the record regarding Cope's qualifications is contained in his CV. His CV provides that he earned a bachelor of science degree in mechanical engineering from Washington University in 1992 and that he earned several awards for creating animated films. His CV lists three instances of experience creating films for lawsuit purposes: one depicting an industrial accident, one depicting an auto accident, and one depicting building construction. Only the auto-accident video is described as a reenactment. There is no indication in his CV, or anywhere else in the record, that Cope has any specialized knowledge, skill, experience, training, or education in the field of crime-scene reconstruction. In fact, there is nothing in the record that Cope had ever done a crime-scene reconstruction. Nor is there any evidence that Cope had ever testified as an expert witness in crime-scene reconstruction or in any related field. Cf. *State v. Clark* (1995), 101 Ohio App.3d 389, 411–412, 655 N.E.2d 795 (listing qualifications of expert witness in field of crime-scene reconstruction).

{¶ 118} Under Evid.R. 104(A), the trial court has discretion in determining whether someone qualifies as an expert witness. Conway has provided no basis for us to conclude that the trial court abused its discretion in deeming that Cope was not qualified as an expert witness. See *State v. Williams* (1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 446 N.E.2d 444.

{¶ 119} Second, Conway did not proffer Cope's testimony; nor is the substance of Cope's expected testimony apparent from the record. Defense counsel's proffer failed to indicate the specific data used to make the video.

{¶ 120} Evid.R. 702(C) requires that an expert's testimony be based on "reliable scientific, technical, or other specialized information." Under Evid.R. 702(C), if the expert's "testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply: (1) The

theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles; (2) The design of the procedure, test, or experiment reliably implements the theory; (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

{¶ 121} "The reliability requirement in Evid.R. 702 is a threshold determination that should focus on a particular type of scientific evidence, not the truth or falsity of alleged scientific fact or truth." *State v. Nemeth* (1998), 82 Ohio St.3d 202, 211, 694 N.E.2d 1332. The Staff Note to Evid.R. 702 directs that questions of reliability are to be directed at principles and methods used by an expert in reaching his or her conclusions, rather than at the correctness or credibility of the conclusions themselves. "Relevant evidence based on valid principles will satisfy the threshold reliability standard for admission of expert testimony." *State v. Nemeth*, 82 Ohio St.3d at 211, 694 N.E.2d 1332; see, also, *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 611, 687 N.E.2d 735.

{¶ 122} Nothing in the record indicates what principles or methods Cope employed in creating the crime-scene reenactment. Because defense counsel failed to proffer Cope's testimony, we are unable to determine whether the excluded evidence is reliable for purposes of Evid.R. 702.

{¶ 123} Finally, Conway has not met the first prong of *Gilmore* that "the exclusion of such evidence must affect a substantial right of the party." 28 Ohio St.3d 190, 28 OBR 278, 503 N.E.2d 147, syllabus. Although Conway argues that the trial court's ruling was prejudicial, he offers no evidence or legal argument to buttress his claim. The information from Cope's video that the defense sought to put before the jury—that Williams had pulled Gervais into the line of fire—was admitted nevertheless in the testimony of two prosecution witnesses. Thus, defense counsel were able to present this information to the jury, and we find no merit to Conway's claim that the exclusion of Cope's testimony and exhibits restricted Conway's right to present a defense.

{¶ 124} *Restrictions on cross-examination.* Conway also argues under this proposition of law that his defense was hampered because the trial court severely limited the cross-examination of Trent. Specifically, Conway contends that he was restricted in challenging Trent's credibility.

{¶ 125} Trent admitted during his testimony that some time before Conway's trial, he had tried to take responsibility for a shooting he did not commit. The shooting was actually committed by Terry Mayle, a friend of Trent's. In October 2000, Trent executed a false affidavit for Mayle's postconviction case, claiming that he, not Mayle, was the actual shooter. Contrary to Conway's assertion, the trial court did allow defense counsel to cross-examine Trent regarding his signing

of this false affidavit. Nevertheless, Conway contends that he was prevented from cross-examining Trent regarding "specific instances of his previous lying."

{¶ 126} The trial court did preclude counsel from cross-examining Trent on the facts of Mayle's criminal case and the details of the false affidavit. But this was not error. Evid.R. 608(B) provides that a witness may, in the court's discretion, be cross-examined as to specific instances of a witness's conduct concerning the witness's character for truthfulness if the conduct is "clearly probative of truthfulness or untruthfulness." Conway has failed to show that the evidence sought to be elicited was clearly probative of Trent's truthfulness or untruthfulness. The facts of Mayle's criminal case were not relevant to Trent's veracity and were therefore not the proper subject of cross-examination under Evid.R. 608(B). The trial court also did not commit error in preventing cross-examination of the details within Trent's affidavit. The jury was well aware that Trent had previously lied under oath. The affidavit did not contain information about Conway's case and possessed limited probative value relating to Trent's untruthfulness.

{¶ 127} We find that the trial court did not abuse its discretion. The jury had all the information it needed to assess Trent's credibility, and Conway does not cite any other instance in which the trial court unduly restricted his counsel's cross-examination. See, e.g., *State v. Brinkley,* 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, at ¶ 106–111. For the reasons stated, proposition of law 21 is rejected.

### Guilt–Phase Jury Instructions

{¶ 128} In proposition of law one, Conway contends that the trial court abused its discretion by denying his requests for jury instructions on voluntary manslaughter and involuntary manslaughter.

{¶ 129} *Voluntary Manslaughter.* R.C. 2903.03(A), which defines voluntary manslaughter, provides, "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *." Voluntary manslaughter is an inferior degree of aggravated murder. *State v. Tyler* (1990), 50 Ohio St.3d 24, 36, 553 N.E.2d 576.

{¶ 130} A defendant charged with aggravated murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the aggravated murder charge and a conviction of voluntary manslaughter. *State v. Shane* (1992), 63 Ohio St.3d 630, 632, 590 N.E.2d 272. Before giving a voluntary-manslaughter instruction in a murder case, the trial court must determine "whether evidence of reasonably

sufficient provocation occasioned by the victim has been presented to warrant such an instruction." Id. at paragraph one of the syllabus.

{¶ 131} In this case, the deceased victim, Gervais, did nothing to provoke Conway. Under R.C. 2903.03(A), the provocation must be "occasioned by the victim." The voluntary-manslaughter statute was amended in 1982 to include the phrase "occasioned by the victim," which forecloses application of the statute to situations, as here, where the provocation came from someone other than the person killed. Am.Sub.H.B. No. 103, 139 Ohio Laws, Part I, 1761, 1763. See, also, 2 LaFave & Scott, Substantive Criminal Law (2003) 510–511, Section 15.2(g). Thus, we find that the trial court did not commit error in refusing to instruct the jury on voluntary manslaughter.

{¶ 132} *Involuntary Manslaughter.* Involuntary manslaughter is a lesser included offense of aggravated murder. *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph one of the syllabus. The difference between the two offenses is the mental state of the accused. Aggravated murder under R.C. 2903.01(A) requires a purpose to kill, with prior calculation and design, while involuntary manslaughter requires only that the killing occur as a proximate result of committing or attempting to commit a felony. R.C. 2903.04(A); *Thomas* at 216–217, 533 N.E.2d 286.

{¶ 133} "Even though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas,* 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. In making this determination, the court must view the evidence in a light most favorable to defendant. *State v. Smith* (2000), 89 Ohio St.3d 323, 331, 731 N.E.2d 645; *State v. Wilkins* (1980), 64 Ohio St.2d 382, 388, 18 O.O.3d 528, 415 N.E.2d 303.

{¶ 134} Nevertheless, an instruction is not warranted every time any evidence is presented on a lesser included offense. There must be "sufficient evidence" to "allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included (or inferior-degree) offense." (Emphasis sic.) *State v. Shane,* 63 Ohio St.3d at 632–633, 590 N.E.2d 272. In view of the evidence presented at trial, even when construed in a light most favorable to Conway, the trial court did not err in refusing to instruct on involuntary manslaughter.

{¶ 135} The basis for an involuntary-manslaughter instruction was Conway's claim that he did not intend to kill Gervais or Williams. Conway did testify that he was not trying to kill anyone. Conway testified that Williams was charging at his brother, that he believed Williams had a knife, and that he grabbed the gun from Myers and started shooting low, "at his hip," in order to stop Williams from

advancing. But this evidence, if accepted by the jury, would constitute a complete defense to the charges of aggravated murder and attempted murder. That is, the jury was obligated to choose between a complete defense—defense of another—and therefore acquittal, or the commission of the crimes of aggravated murder and attempted murder. Although presentation of a complete defense does not automatically preclude a lesser-included-offense instruction, *State v. Wilkins*, 64 Ohio St.2d at 387–388, 18 O.O.3d 528, 415 N.E.2d 303, Conway has not presented any other evidence that the shooting was unintentional.

{¶ 136} Conway's evidence actually shows intentional killing. He testified that he pulled the trigger as fast as he could and fired eight shots at Williams. Gervais and Williams were each hit four times. That Conway hit Gervais and Williams four times each and that the final shots were fired at defenseless victims and at close range belie his denial of a purpose to kill. See, e.g., *State v. Raglin* (1998), 83 Ohio St.3d 253, 257–258, 699 N.E.2d 482; *State v. Sheppard* (1998), 84 Ohio St.3d 230, 236–237, 703 N.E.2d 286; *State v. Palmer*, 80 Ohio St.3d at 562–563, 687 N.E.2d 685.

{¶ 137} Additionally, we have held that "where an inherently dangerous instrumentality was employed, a homicide occurring during the commission of a felony is a natural and probable consequence presumed to have been intended. Such evidence is sufficient to allow a jury to find a purposeful intent to kill." *State v. Jester* (1987), 32 Ohio St.3d 147, 152, 512 N.E.2d 962; *State v. Esparza* (1988), 39 Ohio St.3d 8, 14, 529 N.E.2d 192. This presumption was one of the factors that led us to hold in *Thomas* that an instruction on involuntary manslaughter was not required. *Thomas*, 40 Ohio St.3d at 217–218, 533 N.E.2d 286.

{¶ 138} Any reasonable view of the evidence here shows that Conway possessed an intent to kill. Thus, the trial court did not err in refusing to instruct the jury on the lesser included offense of involuntary manslaughter.

{¶ 139} Even if the refusal to instruct on involuntary manslaughter was error, it was harmless. If the jurors had any doubt about prior calculation and design but were reluctant to acquit, they could have found Conway guilty of murder instead because the trial court did instruct on murder as a lesser included offense in Count 1. The jurors' rejection of that option shows that they would also have rejected the still lesser offense of involuntary manslaughter. See, e.g., *State v. Robb*, 88 Ohio St.3d at 75, 723 N.E.2d 1019. Accordingly, we overrule proposition of law one.

{¶ 140} In proposition of law 11, Conway asserts that the trial court erred in instructing the jury that the doctrine of transferred intent also applied with respect to the R.C. 2929.04(A)(5) aggravating circumstance. As Conway argues, this instruction permitted the jury to convict him of the R.C. 2929.04(A)(5)·

course-of-conduct specification even if the jury believed he had a purpose to kill only one person (Williams).

{¶ 141} Under R.C. 2929.04(A)(5), the death penalty may be imposed for aggravated murder if the state proves beyond a reasonable doubt that "the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender." Conway failed to object on this basis at trial, however, and waived all but plain error. We find no plain error.

{¶ 142} Conway contends that it would be legally impossible for him to be guilty of the purposeful killing of or attempt to kill two or more persons if the jury believed that he did not actually intend to kill Gervais.

{¶ 143} Even disregarding the doctrine of transferred intent, the jury had overwhelming evidence that Conway had a purpose to kill Gervais. "It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts." *State v. Johnson* (1978), 56 Ohio St.2d 35, 39, 10 O.O.3d 78, 381 N.E.2d 637. Intent is gathered from the surrounding facts and circumstances. Id. at 38, 10 O.O.3d 78, 381 N.E.2d 637; *State v. Lott* (1990), 51 Ohio St.3d 160, 168, 555 N.E.2d 293. As previously discussed, Conway armed himself with a loaded firearm and fired eight shots, with the final shots fired from close range at defenseless victims. With this evidence, no reasonable jury could have found that Conway did not purposely intend to kill both Williams and Gervais. The jurors were also instructed that if they found that the state had failed to prove beyond a reasonable doubt any part of the course-of-conduct specification, they must find Conway not guilty of the specification. Therefore, we reject proposition of law 11.

## PENALTY–PHASE ISSUES

### *Penalty–Phase Jury Instructions*

{¶ 144} Conway argues in proposition of law five that he was prejudiced by the trial court's penalty-phase instruction that a life-sentence recommendation must be unanimous. Conway, however, waived this issue by not objecting to the court's instruction or to the life-sentence verdict forms. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Plain error is absent because R.C. 2929.03(D)(2) and Crim.R. 31(A) require that a verdict of life imprisonment be unanimous, and that requirement has been upheld as constitutional. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 213, 15 OBR 311, 473 N.E.2d 264. Therefore, proposition five is overruled.

### Failure to Grant Continuance

{¶ 145} Conway argues in proposition of law 15 that the trial court committed prejudicial error at the outset of the penalty phase in refusing his request for a continuance so that he could retain new counsel.

{¶ 146} On the day that the penalty phase was to begin, defense counsel indicated that Conway's family wanted the mitigation hearing postponed so that Conway could hire new counsel. Conway apparently had wanted to dismiss his attorneys at one point, but defense counsel told the court that they believed that Conway wanted them to represent him in the penalty phase. Nevertheless, the trial court allowed Conway to identify the problems he was having with defense counsel for the record. After a lengthy discussion, the trial court denied the request for a continuance to retain new counsel.

{¶ 147} The determination whether to grant a continuance is entrusted to the broad discretion of the trial court. *State v. Unger* (1981), 67 Ohio St.2d 65, 21 O.O.3d 41, 423 N.E.2d 1078, syllabus. Relevant factors include the length of the delay requested, prior continuances, inconvenience, and the reasons for the delay. *State v. Landrum* (1990), 53 Ohio St.3d 107, 115, 559 N.E.2d 710.

{¶ 148} In addition, " '[a]n indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate "good cause" to warrant substitution of counsel.' " *State v. Cowans* (1999), 87 Ohio St.3d 68, 72, 717 N.E.2d 298, quoting *United States v. Iles* (C.A.6, 1990), 906 F.2d 1122, 1130. The trial court may deny the request to substitute counsel if the complaint is unreasonable. *State v. Deal* (1969), 17 Ohio St.2d 17, 46 O.O.2d 154, 244 N.E.2d 742, syllabus. The trial court's decision is reviewed under an abuse-of-discretion standard. *Cowans*, 87 Ohio St.3d at 73, 717 N.E.2d 298.

{¶ 149} Conway informed the trial court that his chief complaint about his attorneys was their failure to do specific things that he requested. Conway complained that trial counsel had ignored his wishes to show the surveillance tape of the Dockside parking lot on the night of the shooting and had refused to call Britnee Stallings, Conway's girlfriend, as a defense witness. He also complained that he had not been allowed to attend jury-instruction conferences. (See discussion in proposition of law three.)

{¶ 150} Disagreements between attorney and client over trial strategy do not warrant substitution of counsel. See, e.g., *State v. Henness* (1997), 79 Ohio St.3d 53, 65–66, 679 N.E.2d 686; *State v. Hill*, 75 Ohio St.3d at 212, 661 N.E.2d 1068 ("trial courts cannot interfere with counsel's trial tactics or representation of their clients"). Defendants have no constitutional right to determine strategy, and decisions about viable defenses are " 'within the exclusive province of defense counsel to make after consultation with his client.' " *State v. Murphy* (2001), 91

Ohio St.3d 516, 524, 747 N.E.2d 765, quoting *Lewis v. Alexander* (C.A.6, 1993), 11 F.3d 1349, 1354.

{¶ 151} Conway makes no claim that defense counsel failed to discuss strategy concerning presentation of evidence or the calling of witnesses. Conway does not demonstrate a complete breakdown in the attorney-client relationship that jeopardized his right to the effective assistance of counsel. See *State v. Coleman* (1988), 37 Ohio St.3d 286, 525 N.E.2d 792, paragraph four of the syllabus; *State v. Murphy*, 91 Ohio St.3d at 523–524, 747 N.E.2d 765. In fact, the record reflects that defense counsel and Conway were engaged in discussions about his mitigation.

{¶ 152} Furthermore, Conway has not demonstrated that trial counsel's failure to introduce the surveillance tape or call Britnee Stallings as a witness was unreasonable trial strategy. See *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Defense counsel explained that the surveillance tape had little to no value to the defense because it recorded only the order in which people had arrived at the bar and did not record the fight or the shooting. With respect to Britnee Stallings, Conway wanted her called as a witness to establish that he was not carrying a weapon when he arrived at Dockside. That fact was not disputed. Defense counsel also exercised sound strategy in not calling Stallings, because she had served as a conduit to conversations between Conway and Trent, the government's agent, and her testimony might have been damaging to Conway's defense.

{¶ 153} Finally, Conway did not formally request a continuance or substitution of counsel. There was no written request for a continuance or for new counsel, nor did trial counsel request leave to withdraw. In fact, when defense counsel represented to the court that Conway wanted them to go forward with his mitigation case, Conway did not dispute this statement.

{¶ 154} In any event, Conway did not demonstrate good cause to warrant a substitution of counsel. As a result, the trial court did not abuse its discretion by denying a continuance to obtain new counsel. Therefore, we reject proposition of law 15.

### *Juror Misconduct*

{¶ 155} In proposition of law 20, Conway contends that the trial court erred in not granting a mistrial when, according to Conway, it was revealed that jurors had discussed the issue of punishment before the penalty phase.

{¶ 156} Before beginning the penalty phase, juror Guisinger notified the bailiff about a conversation she had had with the first alternate juror, Ms. Benedetti, shortly after the jury had rendered guilty verdicts on all counts and specifications. The trial court conducted a hearing and questioned Guisinger about the

244

conversation. Referring to the jury's verdict, Benedetti had said to Guisinger, "I could never do what you just did." Guisinger responded, "[Y]es, you could." Benedetti then replied, "[T]hat young man looks no worse than the rest of them." After this comment, Guisinger said she changed the subject. Guisinger told the court and counsel that Benedetti's comments would not affect her ability to deliberate impartially in the penalty phase. The trial court then asked counsel whether there were any objections to allowing Guisinger to continue as a juror, and both sides agreed that she should remain on the jury.

{¶ 157} The trial court then examined Benedetti, who denied initiating any conversation about the case or expressing any opinions. Upon further questioning, however, Benedetti admitted that she had asked the other alternate jurors how they would have voted. After questioning the remaining alternates and requestioning Guisinger, the trial court dismissed Benedetti as an alternate juror.

{¶ 158} Defense counsel then said, "Judge, we're going to have to make a motion for a mistrial on all the jurors, especially * * * Guisinger. The other two alternates we don't feel could fill their position." The motion was based on the jurors' and alternate jurors' violation of the court's order not to discuss the case outside the deliberating room. The trial court denied the motion.

{¶ 159} Conway contends on appeal that the trial court erred in not granting a mistrial, because Guisinger could no longer act as an impartial juror during the penalty phase due to her conversation with Benedetti. However, we reject this argument.

{¶ 160} The granting of a mistrial is necessary only when a fair trial is no longer possible. *State v. Franklin* (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1. The remedy for claims of juror partiality is a hearing in which the defendant has an opportunity to prove actual bias. *State v. Phillips* (1995), 74 Ohio St.3d 72, 88, 656 N.E.2d 643, citing *Smith v. Phillips* (1982), 455 U.S. 209, 215–216, 102 S.Ct. 940, 71 L.Ed.2d 78; *Remmer v. United States* (1954), 347 U.S. 227, 229–230, 74 S.Ct. 450, 98 L.Ed. 654. The defense must establish that the improper communication biased the juror. *State v. Keith* (1997), 79 Ohio St.3d 514, 526, 684 N.E.2d 47; *United States v. Zelinka* (C.A.6, 1988), 862 F.2d 92, 95. "In cases involving outside influences on jurors, trial courts are granted broad discretion in dealing with the contact and determining whether to declare a mistrial or to replace an affected juror." *Phillips*, 74 Ohio St.3d at 89, 656 N.E.2d 643.

{¶ 161} The trial court conducted a hearing on this matter, during which Conway failed to establish that Guisinger was biased or that Conway suffered prejudice as a result of the conversation between Guisinger and Benedetti. Contrary to Conway's claim, the discussion between Benedetti and Guisinger did not involve the issue of punishment, the only matter remaining before the jury. See, e.g., *State v. Murphy* (1992), 65 Ohio St.3d 554, 575, 605 N.E.2d 884 ("The

presumption of prejudice to which *Remmer, supra,* refers obtains only where communication with the juror concerns 'the matter pending before the jury' "). Instead, Benedetti's comments to Guisinger concerned the jury's guilt-phase verdicts and occurred after those verdicts were rendered.

{¶ 162} During the hearing, Guisinger testified that Benedetti had initiated the conversation, and presumably upon recognizing that discussing the jury's verdict was improper, Guisinger had "changed the subject." Guisinger also stated that she would not be affected by Benedetti's comments and could remain fair and impartial.

{¶ 163} Although Benedetti claimed that Guisinger had initiated the conversation, the trial court's ruling reflects that the court believed Guisinger and not Benedetti. A trial court is permitted to rely on a juror's testimony in determining that juror's impartiality. *State v. Herring* (2002), 94 Ohio St.3d 246, 259, 762 N.E.2d 940; *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 114. Cf. *State v. Fears* (1999), 86 Ohio St.3d 329, 337–338, 715 N.E.2d 136 (acknowledging that a trial judge is in the best position to observe prospective jurors and decide whether they can be impartial). It was Guisinger, not Benedetti, who first brought the improper contact to the trial court's attention. Benedetti also had engaged in improper discussions with the other alternate jurors.

{¶ 164} The trial court did not abuse its discretion in failing to order a mistrial. We therefore overrule proposition 20.

## INEFFECTIVE ASSISTANCE OF COUNSEL

{¶ 165} Conway makes various claims relating to ineffective assistance of counsel. Reversal of a conviction or sentence based upon ineffective assistance of counsel requires satisfying the two-pronged test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. *Strickland* requires that the defendant show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. Id. at 687–696, 104 S.Ct. 2052, 80 L.Ed.2d 674. In order to show deficient performance, defendant must prove that counsel's performance fell below an objective level of reasonable representation. To show prejudice, defendant must show a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington; State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

### Guilt Phase

{¶ 166} Conway contends in proposition of law four that trial counsel were ineffective in failing to object to inadmissible character evidence about Gervais. Conway claims that trial counsel should have objected to testimony from Benjamin Bechtel that he and Gervais had been friends since high school, testimony describing their high school activities, and testimony about Gervais's college studies and his newly founded business.

{¶ 167} Much of Bechtel's testimony about the victim was admissible during the guilt phase because it depicted the circumstances surrounding the commission of the murder. See *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 439–440, 650 N.E.2d 878. For instance, Bechtel's testimony established his connection to Gervais and why and how Gervais ended up at Dockside on the night he was shot. However, testimony about Gervais's high school activities, his college studies, and how he had formed his new business was not relevant. See Evid.R. 401.

{¶ 168} Nevertheless, the failure to make objections alone is not enough to sustain a claim of ineffective assistance of counsel. *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831; *State v. Gumm* (1995), 73 Ohio St.3d 413, 428, 653 N.E.2d 253. To prevail on such a claim, Conway must show both that there was a substantial violation of counsel's duties and that he was materially prejudiced by counsel's ineffectiveness. *Holloway*, at 244, 527 N.E.2d 831. Even if defense counsel should have objected to this testimony, Conway has failed to show that there was a reasonable probability that the outcome of his trial would have been different had counsel objected. Thus, we reject proposition of law four.

{¶ 169} In proposition of law 19, Conway contends that counsel failed to provide effective assistance in four instances during the guilt phase.

{¶ 170} *Failure to voir dire on racial issues.* Conway claims that counsel rendered ineffective assistance when they failed to request voir dire on racial bias. However, "[t]he conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042. The decision to voir dire on racial prejudice is a choice best left to a capital defendant's counsel. *State v. Watson*, 61 Ohio St.3d at 13, 572 N.E.2d 97, citing *Turner v. Murray*, 476 U.S. at 37, 106 S.Ct. 1683, 90 L.Ed.2d 27, fn. 10; *State v. Smith*, 89 Ohio St.3d at 327, 731 N.E.2d 645.

{¶ 171} Contrary to Conway's assertion, it does not appear that racial bias permeated this case. Some witnesses testified that racial slurs had been exchanged between Conway's group and Williams's group on the night of the shooting. But others, including Conway and his brother, Jeff, did not mention race as a motivating factor in the parking-lot fight or in the shooting. In

addition, because Conway and the person he killed were the same race, defense counsel may have reasonably concluded that race was not an important factor. See *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, at ¶ 138–139. Thus, there is no legitimate basis to conclude that counsel were ineffective for not examining the venire on racial bias.

{¶ 172} *Failure to have Conway review recorded conversations.* Conway claims that trial counsel were ineffective in failing to have him review the tape-recorded conversations between him and Trent before he was cross-examined. We find that counsel did not render ineffective assistance in this regard.

{¶ 173} Although defense counsel did not provide Conway with the tape recordings of his conversations with Trent, they did give him at least some of the transcripts of these tape recordings. The record does not reflect whether Conway had access to all the transcripts, but Conway admitted having reviewed some of them before testifying.

{¶ 174} Even if we determined that counsel were deficient in failing to provide the audiotapes to Conway, there was no prejudice. Before being cross-examined about the taped conversations, Conway was permitted to review the pertinent portions of the tapes and transcripts.

{¶ 175} *Failure to object to testimony of former prosecutor.* Conway maintains that counsel's failure to object to the testimony of former assistant prosecutor DeVillers amounted to ineffective assistance. As we discussed in proposition of law 18, the trial court did not commit error in allowing DeVillers to testify. In addition, Conway claims that DeVillers implied that Conway was a member of a gang. The defense was given the opportunity to clarify that Conway's case did not involve any gang-related activity. Therefore, no basis exists to find deficient performance or prejudice.

{¶ 176} *Defendant's absence from jury–instruction conference.* Conway asserts that counsel were ineffective because he did not attend conferences on proposed jury instructions. As we discussed in proposition of law three, Conway's absence did not deprive him of a fair trial. Thus, Conway has not shown that counsel's allegedly deficient performance affected the outcome of his trial. Defense counsel did not render ineffective assistance during the guilt phase. Therefore, we overrule proposition of law 19.

### Penalty Phase

{¶ 177} In proposition of law seven, Conway raises two claims of ineffective assistance of counsel that allegedly occurred during the penalty phase.

{¶ 178} *Failure to present mitigation evidence.* Conway claims that counsel were ineffective during the penalty phase of his trial because they failed to present relevant mitigating evidence; however, Conway does not identify the

mitigating evidence that counsel failed to present. Nor does the record before the court indicate that other mitigating evidence was available. See *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, at ¶ 59–62. See, also, *Wiggins v. Smith* (2003), 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471. Therefore, this claim is denied.

{¶ 179} *Failure to object to defective penalty-phase instructions.* Conway contends that trial counsel were ineffective for failing to object to defective jury instructions and to the trial court's use of the word "recommend" in conjunction with the jury's decision on the death penalty. These claims are based on alleged errors that we rejected in propositions of law five (penalty-phase jury instructions) and eight (use of word "recommendation"). Thus, we overrule Conway's seventh proposition of law.

## CONSTITUTIONAL ISSUES

{¶ 180} In proposition of law nine, Conway raises various constitutional challenges to Ohio death-penalty statutes, which we reject. Ohio's capital-sentencing scheme is constitutional. See, e.g., *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009; *State v. Smith* (1997) 80 Ohio St.3d 89, 684 N.E.2d 668; *State v. Evans*, 63 Ohio St.3d at 253–254, 586 N.E.2d 1042.

## INDEPENDENT SENTENCE EVALUATION

### *Penalty Phase*

{¶ 181} At the penalty phase, Conway called two mitigation witnesses and gave an unsworn statement.

{¶ 182} James T. Conway Jr., Conway's father, was called as a defense mitigation witness. He testified that Conway is the oldest of his three children. When Conway was a baby, his father was incarcerated for six months for carrying a concealed weapon. His father was also imprisoned for two years when Conway was four or five years old, and Conway visited his father in prison. The father, after serving his sentence, moved back with his family.

{¶ 183} Conway's father said that he had been strict with his children and had tried to get his son to do the right things by ridiculing him. Conway's father said that he had done this to provide Conway a "good start in life," but that Conway had resented him as a result.

{¶ 184} Conway did well in school. In high school, Conway took advanced and college-preparatory courses and was in the band. Conway participated in ROTC and wanted to become a Navy pilot. After high school, he went to Columbus

State Community College. Before attending college, Conway worked for his great-uncle's concrete company and was a good worker.

{¶ 185} Conway has two children, a son and a daughter. Before he was arrested for the Dockside shooting, Conway and his son spent a lot of time together. Finally, Conway's father said that he believes that Conway is sorry for killing Gervais.

{¶ 186} Janice Conway, Conway's mother, also testified. Janice said that during her husband's incarceration, the family's financial situation was not good, and she worked two jobs to support the family. Nevertheless, Conway's family provided him with adequate food, clothing, and shelter. Conway's mother said that Conway looked up to his father and had handled his father's incarceration well. She also said that Conway "always helped with his brother and sister * * *[and] he was just a good boy."

{¶ 187} Conway did well in college. His parents financially supported his efforts to obtain a college degree and helped care for his children while he was taking courses at Columbus State Community College. Conway has the love and support of his siblings and his extended family of grandparents, aunts, uncles, and cousins.

{¶ 188} Conway's mother said that her son was always respectful and helpful around the house. She is sorry for what happened, but she loves her son and does not want him to be executed.

{¶ 189} In Conway's unsworn statement, he told the jury that he wanted to apologize "for putting everyone through this, including all of you guys, the Gervais family, my family, my mom, everybody." Conway said he was not trying to excuse his actions, but he hoped that the jury could "understand the situation and that it wasn't a premeditated thing, it was something that just occurred and there's nothing that I can do to change that * * *. * * * I just hope that you can understand the situation and that it was, just exploded out of hand, went beyond anybody's control in a short period of time, and there's nothing that you can ever do to go back and change it no matter what."

### Sentence Evaluation

{¶ 190} The jury convicted Conway of one death-penalty specification: R.C. 2929.04(A)(5), aggravated murder as part of a course of conduct involving the purposeful killing, or attempt to kill, two or more persons. After independent assessment, we find that the evidence establishes beyond a reasonable doubt the aggravating circumstance charged against Conway. Conway formulated a plan to arm himself with a loaded handgun after learning that his brother had been cut. Conway pursued his brother's attacker, Williams, through a crowded parking lot. Once Williams was in his sight, Conway began shooting and

continued to fire while advancing toward Williams. Conway continued to shoot even after Gervais was in his line of fire. Conway fired eight shots, emptying his weapon and shooting Williams and Gervais four times each. The last shots were fired from close range while the two victims lay on the ground injured and defenseless.

{¶ 191} The evidence shows beyond a reasonable doubt that the murder of Jason Gervais and the attempted murder of Mandel Williams were part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons.

{¶ 192} The circumstances surrounding the offense do prove the existence of the mitigating factor listed in R.C. 2929.04(B)(2). Under this section, a mitigating factor exists if "it is unlikely that the offense would have been committed, but for the fact that the offender was under * * * strong provocation." Witnesses at the scene testified that the shooting occurred after Jeff Conway announced that he had been cut and identified his attacker to Conway. It is reasonable to believe that Conway resorted to the use of a firearm in response to his brother's being cut. Thus, the evidence is sufficient to establish the (B)(2) mitigating factor that Conway acted under strong provocation. See, e.g., *State v. Taylor* (1997), 78 Ohio St.3d 15, 33, 676 N.E.2d 82; *State v. Lawrence* (1989), 44 Ohio St.3d 24, 31–32, 541 N.E.2d 451.

{¶ 193} Nevertheless, we accord minimal weight to this factor. Any effect that provocation has in diminishing the appropriateness of the death sentence is lessened because Gervais, the murder victim, did not himself provoke Conway in any way. See, e.g., *State v. Sowell*, 39 Ohio St.3d at 336, 530 N.E.2d 1294; *State v. Gillard* (1997), 78 Ohio St.3d 548, 556–557, 679 N.E.2d 276. We find nothing else mitigating in the nature and circumstances of the offenses.

{¶ 194} Conway's history, character, and background do provide some mitigation. Yet unlike most convicted murderers that come before us, Conway had a relatively normal childhood. Despite his father's incarceration, Conway grew up in a loving, supportive, and tight-knit family. His parents testified about Conway's moral upbringing, his academic achievements in high school and college, and his gainful employment before attending college. They also testified that Conway had adjusted well to his father's imprisonment and that he had helped his mother with his siblings throughout the ordeal. Conway also has a son and a daughter, whom he apparently supports. He enjoys a close relationship with his son. We therefore conclude that his history, character, and background are entitled to some weight in mitigation. See, e.g., *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, at ¶ 198; *State v. Fox* (1994), 69 Ohio St.3d 183, 194, 631 N.E.2d 124.

{¶ 195} Conway's age of 23 years at the time of the offense qualifies as a mitigating factor under R.C. 2929.04(B)(4) (youth of offender). However, we accord this factor little weight. See, e.g., *State v. Fears,* 86 Ohio St.3d at 349, 715 N.E.2d 136; *State v. Dunlap* (1995), 73 Ohio St.3d 308, 319, 652 N.E.2d 988.

{¶ 196} The love and support of Conway's family qualify as other factors worthy of mitigating weight under R.C. 2929.04(B)(7). Conway's expression of remorse in his unsworn statement, however, is entitled to little weight. See, e.g., *State v. Keene* (1998), 81 Ohio St.3d 646, 671, 693 N.E.2d 246. In his statement, as well as during his testimony, Conway steadfastly maintained that he did not intend to kill anyone, a claim inconsistent with the evidence at trial. See, e.g., *State v. White* (1999), 85 Ohio St.3d 433, 456, 709 N.E.2d 140.

{¶ 197} No evidence was presented on the remaining statutory mitigating factors, R.C. 2929.04(B)(1) (victim inducement), (B)(3) (mental disease or defect), and (B)(6) (accomplice rather than principal offender). Because Conway has a prior conviction for assault on a police officer, R.C. 2929.04(B)(5) (lack of a significant criminal history) is inapplicable.

{¶ 198} We find that the course-of-conduct aggravating circumstance, of which Conway was convicted, outweighs his combined mitigating factors beyond a reasonable doubt.

{¶ 199} Finally, we conclude that the death penalty imposed here is proportionate to death sentences approved in other cases of murder as a course of conduct involving the purposeful killing of or attempt to kill two or more persons. See, e.g., *State v. Davie* (1997), 80 Ohio St.3d 311, 686 N.E.2d 245; *State v. Keith* (1997), 79 Ohio St.3d 514, 684 N.E.2d 47; *State v. Frazier* (1991), 61 Ohio St.3d 247, 574 N.E.2d 483.

{¶ 200} Accordingly, we affirm Conway's convictions and sentences, including his sentence of death.

Judgment affirmed.

MOYER, C.J., RESNICK, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

PFEIFER, J., concurs in part and dissents in part.

———

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 201} I concur in the majority's affirmance of Conway's conviction, but I dissent from its affirmance of the sentence of death. This court's duty to provide an independent sentence review requires us to consider the nature and circumstances of the offense and specifically requires us, pursuant to R.C. 2929.04(B)(2), to consider "[w]hether it is unlikely that the offense would have been committed,

but for the fact that the offender was under duress, coercion, or strong provocation." Unlike R.C. 2903.03(A), which requires provocation "occasioned by the victim" for a finding of voluntary manslaughter, R.C. 2929.04(B)(2) does not so limit our consideration of the passions surrounding a crime. Had Conway not been confronted by the situation in which his brother had just been cut by Mandel Williams, it is unlikely he would have shot Williams and killed Jason Gervais. Had Williams not become entangled with Gervais, possibly on purpose, this could well have been a voluntary-manslaughter case. The circumstances of this offense take it outside the realm of what I consider appropriate for the death penalty.

---

Ron O'Brien, Franklin County Prosecuting Attorney, Jennifer L. Coriell, and Susan E. Day, Assistant Prosecuting Attorneys, for appellee.

Todd W. Barstow and David J. Graeff, for appellant.