[Cite as *State v. Minor*, 2016-Ohio-5492.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 15AP-919 |
| v. | : | (C.P.C. No. 14CR-3493) |
| Ivan Minor, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 23, 2013

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Laura R. Swisher*, for appellee.

**On brief:** *Mark M. Hunt* and *Brian J. Rigg*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Ivan Minor, appeals a judgment of the Franklin County Court of Common Pleas sentencing him to serve a total of 38 years following guilty verdicts in a jury trial on counts of felonious assault, rape, and kidnapping. Because we find no merit in any of Minor's arguments, we affirm the judgment of the trial court.

## I. FACTS AND PROCEDURAL POSTURE

{¶ 2} On July 2, 2014, Minor was indicted (in addition to three other co-defendants[1]) for one count of aggravated robbery, six counts of felonious assault, six counts of rape, and two counts of kidnapping. He pled not guilty on July 7, 2014 and ultimately exercised his right to a jury trial.

---

[1] One of these co-defendants was ultimately not convicted of any offenses, and thus, he is not named. Discussion in this decision is limited to the three defendants who were convicted of crimes concerning the incidents in question.

No. 15AP-919

{¶ 3} The State tried Minor and his three co-defendants in a single proceeding that began on August 3, 2015. At the outset of the trial, the defense stipulated that DNA was properly collected and firearms found at the scene were operable. In addition, one of the two alleged victims in the case, B.P., had not responded to the subpoena, and the State, therefore, sought and received a warrant for his arrest. Following opening statements, the State began to call witnesses.

{¶ 4} The State first called a Columbus police officer. The officer testified that on June 25, 2014, at 2:24 a.m., he was dispatched to Mount Carmel West Hospital where he spoke to a female victim, A.B. He testified that A.B. appeared shaken but the officer admitted he did not know of what she was afraid. Neither A.B. nor the other alleged victim, B.P., had (to his knowledge) called the police, and A.B. did not name anyone who might have hurt her.

{¶ 5} The second witness was also a Columbus police officer. He testified that he picked up A.B. from the hospital for the purpose of identifying a residence on North Harris Avenue where some events relevant to the case were alleged to have transpired. The officer testified that the residence in question was 125 North Harris Avenue.

{¶ 6} The State next called a detective from the crime scene search unit of the Columbus Division of Police. This witness identified photographs taken at 125 North Harris Avenue as well as items of physical evidence recovered. Among the photographs were depictions of a broom with a pole-style handle, a broom handle without a broom end attached, a blue bucket containing a leather belt and a BB gun, a dog cage in a basement, a black and silver handgun, three boxes of ammunition, a number of cell phones, a rifle, and a rifle clip.

{¶ 7} The State then called A.B. as a witness. A.B. testified that she had been, for a period of approximately six years, addicted to heroin but, as of the date of her testimony on August 4, 2015, she had been clean for approximately one year. She explained that she had been acquainted with Minor for around five years and that she and her boyfriend, B.P., went weekly to Minor's house on North Harris Avenue to buy heroin.

{¶ 8} A.B. related that on June 24, 2014, she and B.P. went to Minor's house on North Harris Avenue. A.B.'s testimony varied on the exact sequence of events, whether she and B.P. had been there earlier in the day, whether B.P. was intending to apply a

tattoo at the residence or trade tattooing equipment for heroin, and whether someone called to her from within the house or whether someone called to B.P. However, she testified that once she was inside the house, someone, she was not sure who, displayed a weapon and told her to go in the kitchen, empty her pockets, and strip. Apparently, heroin had gone missing and the people in the house on North Harris Avenue thought she and B.P. had taken it.

{¶ 9}   Once she and B.P. had complied in disrobing, someone, she was not sure who, performed cavity searches on her and B.P. in the kitchen. Some time later, she and B.P. were taken into the basement of the house where Minor and other unidentified persons also performed anal and vaginal cavity searches on her using gloves from A.B.'s purse which she had for tattooing purposes. In the basement, a number of unidentified persons, not believing A.B. and B.P.'s protestations that they had not stolen heroin, began to beat B.P.

{¶ 10}  The beating began with a bottle but they also used a BB gun, a leather strap, a knife, as well as feet and hands. A.B. was able to identify the BB gun, bucket, and strap offered into evidence among the State's trial exhibits. Specifically, A.B. testified that some people (whom she simply referred to as "they") broke the bottle on B.P.'s head, stomped him with their feet, hit him with their hands, wetted the leather strap and whipped his back with it, smashed his toes with the butt of the BB gun, and shot him in the bottom and the genitals with the BB gun. (Tr. Vol. 2 at 128-30.) They also forced B.P. into a dog cage and sodomized him anally with a broom handle without a broom attached to it. At times when B.P. passed out, they dumped cold water on him to revive him for further beatings. Also, while B.P. was in the cage, they were heating up a knife tip and branding him with it. In addition, A.B. testified that, someone (she did not know who) kicked her in the head a couple of times when the beating first started.

{¶ 11}  At no time did A.B. identify who did what during the beatings except to say that Minor and one of his co-defendants, Davonte Clark, stomped B.P. and hit him with their hands. A.B. estimated that she was kept in the basement for at least six hours before she was allowed to leave. She did not attempt to leave or check if the door was locked. However, according to her testimony, Minor and his three co-defendants came

No. 15AP-919

downstairs at points to make sure she and B.P. were down there. She also said someone recorded a video of her, naked on top of B.P.'s cage, urinating on him.

{¶ 12} Toward the end of the night, someone gave A.B. some heroin and B.P. some meth to help with their pain and withdrawal sickness. Eventually, the captors let A.B. and B.P. go free, reasoning that it had begun to rain outside and any heroin that A.B. and B.P. might have stolen and stashed outside would be ruined. At least Minor, and maybe other persons, warned A.B. and B.P. not to call the police. When she retrieved her belongings and got dressed, A.B. was missing three cell phones and $30. However, neither she nor B.P. called the police. Instead they walked to a friend's house who, when it was apparent that B.P.'s health was poor, took them to Mount Carmel West Hospital.

{¶ 13} A.B. was able to identify all four defendants at trial. However, she admitted on cross-examination that she was in heroin withdrawal during the ordeal and that heroin has a mind-altering effect that can make things seem real that are not. She explained that neither of the co-defendants, Charles Reed and Davonte Clark, had raped or assaulted her. She reiterated, however, that Minor had cavity-searched her and that he beat B.P. She had no memory of speaking to nurses at the hospital and relating that she had been penetrated.

{¶ 14} The next grouping of witnesses was composed of staff from Mount Carmel West Hospital; three sexual assault nurses who collected forensic observations and took photographs of the injuries sustained by A.B. and B.P. and a resident physician who treated B.P. According to the physician's testimony, B.P. presented with numerous lacerations, a broken rib, a collapsed left lung, a ruptured spleen rating 4 of 5 on the severity scale, a broken toe, a fractured tailbone, a bruised scrotum, and abrasions around his anus. He was admitted to the intensive care unit and remained there for 5 days. The forensic nurse manager for Mount Carmel Health System also testified, describing the photographed injuries to B.P. and authenticating the exhibits showing injuries.

{¶ 15} Another nurse testified that she performed an exam of A.B. and testified to bruising and other minor injuries to A.B. visible in photographs. This nurse testified that A.B. told her that fingers had been used to penetrate her vaginal area and "butt." (Tr. Vol. 2 at 458.) The nurses also testified that they swabbed areas where foreign DNA might

No. 15AP-919

have been present based on the history recounted by A.B. and B.P. and preserved the rape kit for the police.

{¶ 16} The State next called a DNA expert forensic scientist with the Ohio Bureau of Criminal Investigation. According to the expert, DNA tests were run on the rape kits collected from A.B. and B.P., as well as numerous articles found at the scene like the broom handle, BB gun, and pistol. No foreign DNA sufficient for comparison with conventional DNA testing was found in the rape kits or on any of the articles except the BB gun. And Minor, Clark, and Reed could be excluded as contributors to the DNA mixture obtained from the BB gun. The expert testified that Y-STR DNA testing yields a less exact result. The testing produced two DNA profiles on one end of one broom handle, a major and a minor profile. The major profile was consistent with B.P. but Minor, Clark, and Reed were all excluded as contributors to the minor profile.

{¶ 17} Thereafter, a canine handling officer for the Columbus Division of Police testified that on June 25, 2014, he was called to 125 North Harris Avenue at 6:24 a.m. with the SWAT team to help effect an arrest because, despite the police having announced their presence, people were not coming out of the house. He testified that after about 15 or 20 minutes, co-defendant Reed jumped from the second floor window and began limping toward him and a SWAT officer. Because Reed did not immediately get on the ground when ordered to do so, the SWAT officer hit him with the barrel of his rifle and they arrested him. Other than Reed, everyone else who was in the house came out in an orderly and respectful fashion with their hands raised.

{¶ 18} The final witness called by the State was an expert in cell phone analysis with the Columbus Division of Police. He testified that a detective assigned to the case presented him with an Apple iPhone 4 and asked him to obtain the phone's contents. He was able to use software to bypass the phone's security code and download the contents. Both the Apple ID and the Kik[2] ID information on the phone were associated with the name "Charles Reed." (Tr. Vol. 3 at 575-77.) The expert explained, that from his review of the phone's contents he was able to determine that on June 24, 2014, at 5:18 p.m., a text was sent from the iPhone to a recipient named "Destiny" which said, "I am on Harris." (Tr. Vol. 3 at 578.) Then at 1:05 a.m. on June 25, the iPhone received a message that said,

---

[2] Kik is a messaging application.

No. 15AP-919

"[d]id that situation resolve itself at Harris?" (Tr. Vol. 3 at 579.)  In addition, the iPhone contained a video showing A.B. naked in front of a dog cage appearing to urinate on B.P. The expert explained that while he could not say that this particular phone took the video, he could discern that the video was taken by the same model of phone running the same edition of the operating system, that the video was taken on June 24, 2014, at 4:46 p.m., and that it was taken at the house on North Harris Avenue.

{¶ 19} Following the last of its witnesses and the admission of exhibits, the trial court heard motions by the defendants for acquittal under Crim.R. 29.  The State admitted that the evidence was insufficient on three counts of the indictment as to all defendants and the court dismissed those counts.  However, midway though arguments on motions to dismiss as to the remaining counts, the prosecutor received a call notifying her that B.P. had been arrested.  She, therefore, requested that the trial court allow her to reopen the State's case in order to call him as a witness.   All defendants objected.   The trial court heard and ruled on the remaining Crim.R. 29 motions before determining whether to permit the State to reopen its case to obtain B.P.'s testimony.  As to Minor, Clark, and Reed, the trial court denied the Crim.R. 29 motions as to the remainder of the counts not conceded by the State.

{¶ 20} After an interval in which counsel researched and presented arguments on the propriety of reopening a case in order to allow additional witnesses after the State has rested, the trial court concluded it had discretion in the matter and declined to allow the State to reopen its case after having rested.  The trial court reasoned that while B.P.'s testimony would likely be both relevant and admissible, the defendants would be considerably prejudiced in that they had made strategic decisions in how they had chosen to try their cases based on the premise that B.P. would not be called as a witness at trial.

{¶ 21} Following that ruling, counsel for Minor asked for a continuance in order to interview B.P.  Counsel for Minor explained that he had planned to call witnesses on behalf of Minor but was concerned that doing so would give the State an opportunity to call B.P. in rebuttal which, depending on what B.P. might say, could endanger Minor's chances of acquittal.  However, although the trial court consented to give Minor's counsel 15 minutes to confer with colleagues and weigh the matter, it did not allow him any longer continuance in order to meet with B.P. and determine the likely gist of B.P.'s testimony

No. 15AP-919

were he to be called upon rebuttal. Ultimately, having weighed the strategic concerns, counsel for Minor concluded not to call any witnesses so as to avoid the possibility of allowing the State to call B.P. in rebuttal.

{¶ 22} After closing arguments, jury instructions, and deliberations, on August 11, 2015, the jury returned verdicts. The jury found Minor, Reed, and Clark each guilty of five counts of felonious assault and two counts of kidnapping. It also found that Minor and Clark were each guilty of two counts of rape. It found all four defendants not guilty on all remaining counts.

{¶ 23} On September 29, 2015, the trial court held a sentencing hearing. B.P. testified at the sentencing hearing on Minor's behalf stating that he and Minor are friends, that Minor did not play a role in torturing B.P., and that when Minor returned to the house it was he who helped B.P. get his clothes and get out of the basement. B.P. also filed an affidavit with the court prior to sentencing to similar effect. The trial court, however, disbelieved B.P., concluded (consistent with A.B.'s testimony at trial) that Minor played a significant role in the offense, and after a lengthy explanation of the factors and purposes of sentencing, sentenced Minor to a total of 38 years in prison. Specifically, the trial court determined that the felonious assault counts should merge and sentenced Minor to 8 years on the merged count, 8 years on each of the 2 rape counts, and 7 years on each of the 2 kidnapping counts, each to be served consecutively to the others.

{¶ 24} Minor now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 25} Minor raises four assignments of error for review:

> [I.] THE VERDICTS OF GUILTY TO FELONIOUS ASSAULT, RAPE, AND KIDNAPPING ARE AGAINST THE SUFFICIENCY AND MANIFEST WEIGHT OF THE EVIDENCE.

> [II.] TRIAL COURT ERRED IN DENYING APPELLANT'S REQUEST FOR A CONTINUANCE TO ALLOW APPELLANT'S COUNSEL TO QUESTION A KEY WITNESS; THUS DENYING APPELLANT OF HIS RIGHT TO A FAIR TRIAL.

> [III.] APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR TRIAL BECAUSE TRIAL COUNSEL DID NOT PRODUCE ANY WITNESSES ON

No. 15AP-919

APPELLANT'S BEHALF AND DID NOT EFFECTIVELY LOCATE A KEY WITNESS.

[IV.] THE TRIAL COURT ERRED BY IMPROPERLY SENTENCING APPELLANT TO CONSECUTIVE TERMS OF INCARCERATION SINCE THE SENTENCE DID NOT FOLLOW THE OHIO SENTENCING STATUTES.

## III. DISCUSSION

### A. First Assignment of Error—Whether the Convictions were Sufficiently Supported by the Evidence and Whether they were Contrary to the Manifest Weight of the Evidence

{¶ 26} In his first assignment of error, Minor alleges that his convictions were not supported by sufficient evidence and that they were against the manifest weight of the evidence. Minor's brief conflates the concepts, with repeated arguments that the evidence was insufficient because A.B. was "unreliable." (Minor's Brief at 13, 15, 18.) The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶ 27} Sufficiency is:

"[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley* at ¶ 11, quoting *Thompkins* at 386; *Black's Law Dictionary* 1433 (6th Ed.1990). "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 28} By contrast:

Weight of the evidence concerns "the inclination *of the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof

No. 15AP-919

> will be entitled to their verdict * * *. Weight is not a question
> of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's* at 1594. For a manifest weight analysis "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Thompkins* at 388, quoting *Tibbs v. Fla.*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 29} There are also noteworthy differences in how the two concepts are treated procedurally. While a majority of a reviewing court may find that evidence was insufficient, "[n]o judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." Ohio Constitution, Article IV, Section 3(B)(3); *Thompkins* at paragraphs three and four of the syllabus. In addition, the consequences of appellate findings on manifest weight as opposed to sufficiency are different. "[T]he Double Jeopardy Clause does not preclude retrial of a defendant if the reversal was grounded upon a finding that the conviction was against the weight of the evidence. However, retrial is barred if the reversal was based upon a finding that the evidence was legally insufficient to support the conviction." *Id.* at 387, citing *Tibbs* at 47.

### 1. Felonious Assault

{¶ 30} In Ohio, the offense of felonious assault includes the following prohibition:

> No person shall knowingly do * * * the following:
>
> (1) Cause serious physical harm to another * * * .

R.C. 2903.11(A)(1). "Serious physical harm" is separately defined in relevant part as:

> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> * * *

No. 15AP-919

> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5)(b), (c) and (e).

{¶ 31} A.B. testified that Minor and Clark stomped B.P. with their feet and hit him with their hands. The physician from Mount Carmel West Hospital who treated B.P. testified that B.P. presented with, among other injuries, a broken rib, a collapsed left lung, and a ruptured spleen rating 4 of 5 on the severity scale. The physician testified that due to his condition, B.P. was admitted to the intensive care unit where he remained throughout his 5-day hospitalization. This testimony, when considered in the " 'light most favorable to the prosecution' " was sufficient to support Minor's conviction for felonious assault. *Monroe* at ¶ 47, quoting *Jenks* at paragraph two of the syllabus.

{¶ 32} When considering manifest weight of the evidence, there was no suggestion by the evidence that B.P.'s injuries were feigned or that the physician who testified was not credible or incorrect in his testimony. When considering whether the evidence introduced at trial was weighty enough to support the conviction, the issue resolves to a question of whether A.B. was credible in reporting how B.P. sustained the injuries and at whose hands.

{¶ 33} A.B. was, at the time of the incident, a heroin addict who was experiencing symptoms of withdrawal. Her testimony was inconsistent throughout trial about who did what and how many assailants there were. Rather than make allegations about any specific defendant, she repeatedly used vague pronouns such as "they" or "them." (Tr. Vol. 2 at 128-30.) She also, at one point, appeared to testify that many of the people who harmed her were not defendants at trial. A.B. admitted to being a thief and "boosting" (stealing barter items to obtain heroin) repeatedly for ten years. (Tr. Vol. 2 at 208.) She admitted to having lied to the police when she spoke to them at the hospital. A.B. also admitted she did not remember what she said at the hospital or whether she had initially claimed to have been raped by four or five men. No blood was collected in the basement of the residence on North Harris Avenue, as might have been expected had B.P. been beaten as badly as A.B. testified he was at that location. Finally, Minor was excluded as a contributor to all the useable DNA samples collected from bodies of B.P. and A.B. as well as the various implements allegedly used on B.P.

No. 15AP-919

{¶ 34} However, A.B.'s testimony that B.P. was stomped was corroborated by the fact that B.P. had a collapsed lung, broken rib, and ruptured spleen when he arrived at the hospital. A.B.'s and B.P.'s presence at the house at 125 North Harris Avenue earlier that evening was corroborated by the fact that a cell phone video depicting them was shot at that location on June 24, 2014 at 4:46 p.m. Moreover, the general character of the interaction on North Harris Avenue is corroborated by the grainy video. That A.B. knew Minor, having purchased heroin weekly for five years from him at his house at 125 North Harris Avenue, helps to confirm the veracity of A.B.'s identification of Minor as a perpetrator.

{¶ 35} After review of the record, we cannot say, based on the evidence in this case, that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. We conclude that the conviction for felonious assault is not against the manifest weight of the evidence.

### 2. Rape

{¶ 36} In Ohio, the offense of rape is defined by statute, in relevant part, as follows:

> No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

R.C. 2907.02(A)(2). "Sexual conduct" is defined to include "the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another" when accomplished "without privilege to do so." R.C. 2907.01(A). In addition, a person is complicit in the sense potentially relevant here when, "acting with the kind of culpability required for the commission of an offense" the person "[a]id[s] or abet[s] another in committing the offense." R.C. 2923.03(A)(2). A person who is complicit in an offense "shall be prosecuted and punished as if he were a principal offender." R.C. 2923.03(F).

{¶ 37} A.B. testified that someone in the house (she was not sure who) was holding a gun on her and B.P. Someone (it is not clear from her testimony if it was the same unknown person or a different unknown person) told her to strip. A.B. testified that someone, she was not sure who, administered a vaginal cavity search in the kitchen and that Minor performed anal and vaginal cavity searches on her once she had stripped and

No. 15AP-919

gone into the basement of 125 North Harris Avenue.[3] She also testified, however, that the gun had been put away and was not out at the point when the cavity searches occurred.

{¶ 38} "Body cavity search" is defined in two places in the Ohio Revised Code. In both instances, it is defined as "an inspection of the anal or vaginal cavity of a person that is conducted visually, manually, by means of any instrument, apparatus, or object, or in any other manner." R.C. 2933.32(A)(1); R.C. 5120.421(A)(1). Black's Law Dictionary defines two types of body cavity searches. A "manual body-cavity search" is "[a] strip search in which the police engage in some touching or probing of a person's orifices. – Also termed *digital body-cavity search.*" (Emphasis sic.) *Black's Law Dictionary* 1552 (10th Ed.2014). A "visual body-cavity search" is "[a] strip search in which, without touching, a law-enforcement officer closely inspects a person's orifices. – Also termed *visual body-cavity inspection.*" (Emphasis sic.) *Black's* at 1553. In other words, although a body cavity search clearly can involve penetration, it does not, by definition require or necessitate penetration or insertion.

{¶ 39} A.B.'s testimony at least suggested that penetration occurred because she referred to being cavity searched with a gloved hand. Taken in combination with the fact that the hospital records introduced in the case show representations that vaginal and "butt" penetration occurred, we find the evidence before the jury sufficient, when taking the view most favorable to the prosecution, for a jury to find there was evidence that some penetration occurred. The force element is satisfied by evidence that A.B. was compelled at gunpoint to strip in preparation for the search. Although the gun was later put away, taking the view of the facts most favorable to the prosecution, A.B.'s testimony supported an inference that Minor had presented a continuing implied threat of violence when he required A.B. to submit to cavity searches in the basement, shortly after she was forced at gunpoint to strip. Minor's rape convictions were supported by sufficient evidence on each element.[4]

---

[3] She also testified that some unknown persons performed cavity searches on B.P. as well. However, Minor was convicted only of rape counts associated with the penetration of A.B.'s anal and vaginal cavities; thus, we address that issue no further here.

[4] Although A.B. testified that someone used a broom handle to penetrate B.P. anally, she never said who did that. Moreover, Minor was convicted only of rape counts associated with the penetration of A.B.'s anal and vaginal cavities.

No. 15AP-919

{¶ 40} On the question of weight, A.B.'s testimony suffers from the same credibility problems as identified regarding the counts of felonious assault, that she admitted to thieving regularly, lying to the police, and being a heroin addict experiencing withdrawal at the time of the events. As was true of the felonious assault counts, she gave muddled, sometimes inconsistent, and almost universally vague testimony. Further, no foreign DNA was recovered from her person that could have been matched to Minor (although this could be explained by the allegation that Minor wore gloves). However, as was also true in the felonious assault discussion, A.B.'s identification of Minor is bolstered by the fact that she saw him weekly to buy drugs. A.B.'s general testimony that she was forced to endure a cavity search in the basement of 125 North Harris Avenue is corroborated by the video of her, naked, obviously in some distress, in the basement of 125 North Harris Avenue. While there may be issues presented in A.B.'s testimony that created doubt about Minor's guilt of the rape charges involving A.B., we cannot say that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387.

### 3. Kidnapping

{¶ 41} The Ohio Revised Code defines the offense of kidnapping, in relevant part, as follows:

> (A) No person, by force [or] threat, * * * shall * * * restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (2) To facilitate the commission of any felony or flight thereafter;
>
> (3) To terrorize, or to inflict serious physical harm on the victim or another;
>
> * * *
>
> (B) No person, by force [or] threat, * * * shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim * * * :
>
> * * *
>
> (2) Restrain another of the other person's liberty.

R.C. 2905.01(A)(2),(3) and (B)(2). A person who is complicit in an offense "shall be prosecuted and punished as if he were a principal offender," and a person may be found to be complicit when, "acting with the kind of culpability required for the commission of an offense," the person "[a]id[s] or abet[s] another in committing the offense." R.C. 2923.03(A)(2) and (F).

{¶ 42} A.B. testified that after she and B.P. were forced at gunpoint to strip naked and sent into the basement, they were not permitted to leave for six hours. Although A.B. testified that she did not check to see if the basement door was locked, a number of persons, including Minor, came down to the basement from time to time to make sure they were still there. In addition, A.B. testified that Minor caused serious physical harm to B.P. while B.P. was being held in the basement. This evidence was sufficient to sustain the convictions for kidnapping as defined above.

{¶ 43} Despite the general vagueness of A.B.'s testimony and the other issues affecting her credibility, the video shot of A.B. and B.P. in the basement of 125 North Harris Avenue is strong corroborating evidence that A.B. and B.P. were being forcibly kept for some period of time in the basement of that premises. Under the circumstances and after review of the record, we cannot say that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. We thus determine that the convictions for kidnapping are not against the manifest weight of the evidence.

{¶ 44} Minor's first assignment of error is overruled.

**B. Second Assignment of Error—Whether it was Error for the Trial Court to have Denied Trial Counsel a Continuance in which to Interview a Witness**

{¶ 45} Minor now argues on appeal that it was prejudicial error for the trial court to have denied his motion for continuance in order for his counsel the opportunity to interview B.P.

{¶ 46} "The determination whether to grant a continuance is entrusted to the broad discretion of the trial court. Relevant factors include the length of the delay requested, prior continuances, inconvenience, and the reasons for the delay." (Citations deleted.) *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 147, citing *State v. Landrum*, 53 Ohio St.3d 107, 115 (1990); *State v. Unger*, 67 Ohio St.2d 65 (1981),

No. 15AP-919

syllabus. In this case, the delay contemplated was short, but there had been six prior continuances at the joint request of the parties.[5] Moreover, the continuance concerned in this assignment of error was sought during an ongoing jury trial involving four defendants. Between the trial court, court staff, the jurors, counsel for all parties, and witnesses, there was considerable potential for inconvenience in even a short delay. In addition, while counsel is certainly not prohibited from attempting to interview witnesses before he or she testifies, there is no specifically enumerated right to interview witnesses before they take the stand. *Atkins v. State*, 115 Ohio St. 542, 553 (1927). Further, nothing prevents a witness from simply refusing to speak to counsel. *State v. Zeh*, 31 Ohio St.3d 99 (1987), paragraph one of the syllabus. While it would have been desirable for Minor's counsel to have had the opportunity to attempt to discuss B.P.'s testimony with him before finally deciding whether B.P. would testify, we cannot conclude that the trial court abused its discretion in refusing to interrupt a jury trial in order to allow counsel an opportunity not defined in the law as a right.

{¶ 47} Minor's second assignment of error is overruled.

## C. Third Assignment of Error—Whether Minor was Denied Effective Assistance of Counsel

{¶ 48} Ineffective assistance of counsel claims are assessed using the two-pronged approach set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

{¶ 49} Minor's appellate counsel argue that trial counsel was ineffective because:

> There were multiple people inside of 125 Harris Avenue on the night of June 24, 2015. [A.B.] testified that multiple unidentified people came downstairs to make sure that they

---

[5] We recognize the logistical difficulty of harmonizing the trial court's schedule with the various schedules of trial counsel for four co-defendants to be tried simultaneously, but the trial court was within its discretion to control the matter of continuances during the jury trial once it had begun and after the State had rested.

were still down there. She was unsure whether the number of people in the residence was more or less than ten, but there were less than twenty. None of these other individuals who were present in the house or who came to check on [A.B.] and [B.P.] in the basement were brought to court to testify.

Further, [A.B.] and [B.P.] walked two blocks to their friend's house where they were taken to Mount Carmel West. Neither any witnesses who saw [A.B.] and [B.P.] walking down the street nor the friend who took them to the hospital were called to testify at trial. There were no witnesses presented by trial counsel to testify on Appellant's behalf. This ultimately changed the result of the trial and for this, Appellant was denied a fair trial.

(Records citations deleted.) (Minor Brief at 22-23.) Lacking from this argument is any allegation of what Minor's counsel did or did not do regarding these issues that would have changed the outcome of the trial. Nor is there an explanation of why inclusion of any of these witnesses (assuming they even existed or could have been identified, which is not reflected in the record) would probably have altered the result—a necessary finding to satisfy *Strickland*. Because this argument fails, the entire allegation of ineffective assistance of counsel cannot be sustained with respect to the presentation of witnesses.

{¶ 50} Minor's appellate counsel also argues that Minor's trial counsel's performance was ineffective because he failed to locate B.P.:

Appellant's trial attorney could not locate [B.P.] for trial. Trial counsel had an "investigator who is very experienced, who for a long time was trying to get ahold of [B.P.]" but could not do so. Shortly after the State rested its case, while the defense attorneys were in the middle of making their Rule 29 motions, the Court was notified that [B.P.] had been arrested. The police found [B.P.]; however, trial counsel's investigator could not. If [B.P.] was able to be located and interviewed, there is a reasonable probability that the proceeding would have had a different result.

(Record citations deleted.) (*Id.* at 23.) As appellate counsel concedes, trial counsel hired an investigator to attempt to track down B.P., and even the police did not find B.P. in time to procure his presence for trial. How trial counsel was arguably deficient in attempting to find B.P. is not clear from appellate counsel's conclusory statements. As deficient performance is one of the two necessary prongs of *Strickland*, this conclusory argument fails also.

{¶ 51} Minor's third assignment of error is overruled.

### D. Fourth Assignment of Error—Whether the Trial Court Properly Complied with R.C. 2929.14(C)(4) in Sentencing Minor to Consecutive Sentences

{¶ 52} Ohio Revised Code 2929.14(C)(4) specifies a number of findings a trial court must make when it sentences an offender to serve consecutive terms of imprisonment:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

The Supreme Court has more than once held that:

> [I]f a trial judge exercises his or her discretion to impose consecutive sentences, he or she must make the consecutive-sentence findings set out in R.C. 2929.14(C)(4), and those findings must be made at the sentencing hearing and incorporated into the sentencing entry.

*State v. Sergent*, ___ Ohio St.3d ___, 2016-Ohio-2696, ¶ 17, citing *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶ 23.

No. 15AP-919

{¶ 53} In this case, the trial court orally explained in the sentencing hearing that it was considering and making the findings required by R.C. 2929.14(C)(4) as follows:

> For the record, pursuant to Revised Code Section 2929.14, subsection C-4, the court is going to impose consecutive sentences in order to ensure the safety of the public from future crime, to punish the offender, and the consecutive sentences are necessary and are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public.
>
> The court will also make the finding specific to section C-4 (B), that at least two of the multiple offenses were committed as a part of one or more courses of conduct, and the harm caused by two or more people of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as a part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct. Pursuant to Revised Code Section 2929.14 subsection C-4 as well as subsection C-4 (B) the court is going to impose consecutive sentences.

(Tr. Vol. 7 at 924-25.) Then, in its judgment entry, the trial court incorporated and added to those findings as follows:

> The Court made findings on the record, pursuant to R.C. 2929.14(C)(4), to support consecutive sentences. Considering the facts of this case, the purposes and principals of sentencing, and the requirements set forth in R.C. 2929.14(C)(4), the Court finds that a consecutive sentence is both necessary and appropriate. The Court further finds that (a) a consecutive sentence is necessary to punish Defendant, given the seriousness of the offenses committed; (b) a consecutive sentence is not disproportionate to the seriousness of Defendant's conduct; (c) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct; and (d) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

(Oct. 1, 2015 Jgmt. Entry at 2.)

No. 15AP-919

{¶ 54} Minor's brief does not address or attempt to explain why the above-quoted findings by the trial court (which are facially sufficient and that almost verbatim recite the findings required by R.C. 2929.14(C)(4)) are error. The assertion in the brief that the trial court failed to make necessary findings without more is insufficient to sustain the fourth assignment of error.

{¶ 55} However, we do note that the sentencing entry refers to Minor having pled guilty to the offenses of which the jury found him guilty, and we instruct the trial court to enter a nunc pro tunc order correcting the sentencing entry.

{¶ 56} Minor's fourth assignment of error is overruled.

## IV. CONCLUSION

{¶ 57} Because Minor's convictions are supported by sufficient evidence and not contrary to the manifest weight of the evidence, and because we find no merit in any of Minor's other assignments of error, we overrule all four assignments of error and affirm the judgment of the Franklin County Court of Common Pleas. Having noticed an error in the sentencing entry having no substantive effect on Minor's sentence, we remand this case and instruct the trial court to enter a nunc pro tunc entry correcting the sentencing entry in accord with our instructions.

*Judgment affirmed;*
*cause remanded with instructions.*

DORRIAN, P.J., and SADLER, J., concur.